IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ROBERT BOGGS,

                       Plaintiff,                         CV-07-954-ST

        v.                                   FINDINGS AND
                                             RECOMMENDATIONS

MICHAEL SCHRUNK and MULTNOMAH
COUNTY,

                       Defendants.

STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiff, Robert Boggs ("Boggs"), served as the Chief Deputy Medical Examiner of the Multnomah County Medical Examiner's Office for over five years from August 1, 2001, until early 2007 when he was asked to resign under threat of termination. On May 10, 2007, Boggs filed this action in Multnomah County Circuit Court, *Robert Boggs v. Michael Schrunk and Multnomah County*, Case No. 0705-05342, alleging a state law claim for declaratory and injunctive relief against Multnomah County and Multnomah County District Attorney Michael

1 - FINDINGS AND RECOMMENDATIONS

Schrunk ("Schrunk"), as well as two claims for intentional interference with employment against

Schrunk, and a wage claim against Multnomah County.  Boggs subsequently amended his

pleadings to include a claim for violation of 42 USC § 1983.  First Amended Complaint, ¶¶ 36-

41.  Defendants thereafter timely removed the action to this court.  Notice of Removal (docket

#1), ¶ 5.

This court has original jurisdiction over Boggs' federal statutory claim under 28 USC

§ 1331 and supplemental jurisdiction over his related state-law claims pursuant to 28 USC

§ 1367(a).

Both sides have now filed motions for summary judgment.  Boggs contends that he is

entitled to partial summary judgment that: (1) Schrunk lacked authority to terminate him or force

his resignation; and (2) defendants are unable to carry their burden of proving that Boggs would

have been terminated for misconduct learned of after his termination.  Multnomah County and

Schrunk both seek summary judgment against each of Boggs' five claims on a variety of

grounds.  For the reasons that follow, Boggs' motion should be denied and defendants should be

granted summary judgment against all claims except the Fifth Claim (Due Process violation)

against Multnomah County.

## **LEGAL STANDARD**

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any

material fact and "the moving party is entitled to judgment as a matter of law."  The moving

party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 US 317,

323 (1986).  Once the moving party does so, the nonmoving party must "go beyond the

pleadings" and designate specific facts showing a "genuine issue for trial."  *Id* at 324, citing

FRCP 56(e).  The court must "not weigh the evidence or determine the truth of the matter, but only [determine] whether there is a genuine issue for trial."  *Balint v. Carson City, Nev.*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted).  A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact.  *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material.  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987).  The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party."  *Id* (citation omitted).  However, when the non-moving party's claims are factually implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial.  *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics Inc.*, 818 F2d 1466, 1468 (9th Cir 1987), *cert denied*, 484 US 1006 (1988) (citation omitted).  The Ninth Circuit has stated, "[n]o longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment."  *Id*.

## UNDISPUTED FACTS

In the 1990's, Boggs worked as a part-time Pathology Assistant for the Multnomah County Health Department in the Division of the Medical Examiner.  Short Decl. (docket #74), Exhibit 20 ("Boggs Depo."), p. 8.  On October 27, 1997, Boggs applied for and was appointed to a Deputy Medical Examiner position for the Multnomah County District Attorney's Office in the division of the Medical Examiner.  *Id*.  Boggs was promoted to the position of Chief Deputy

Medical Examiner on July 20, 2001, and began working in that position on August 1, 2001. *Id* at 9.

As Chief Deputy Medical Examiner, Boggs supervised Multnomah County deputy medical examiners and other personnel. Multnomah County's class specifications for deputy medical examiners require that they receive general supervision from the Chief Deputy Medical Examiner, as well as the State Medical Examiner. The deputy medical examiners are non-exempt union members of the American Federation of State, County and Municipal Employees ("AFSCME"), Local 88. Stewart Decl., ¶ 7. Dr. Karen Gunson ("Dr. Gunson"), the State Medical Examiner, supervised all employees in the Multnomah County Medical Examiner's Office, and all employees in that office reported directly to Dr. Gunson or indirectly to her through Boggs. Boggs Decl., ¶ 13. Neither Boggs nor other employees in the Medical Examiner's Office had a direct reporting relationship with Schrunk or other employees in the District Attorney's Office. *Id.*

As a supervisor, Boggs followed Multnomah County personnel rules and consulted with the District Attorney's Office about personnel matters and processing of personnel forms and administrative paperwork. Stewart Decl., ¶ 13; Boggs Decl., ¶ 14. However, the District Attorney's Office did not interfere with the substantive personnel decisions made within the Medical Examiner's Office. Boggs Decl., ¶ 14.

In early 2007, the Multnomah County Medical Examiner's Office employed nine regular staff, some on-call employees, and the Chief Deputy Medical Examiner. Stewart Decl., ¶ 11.

4 - FINDINGS AND RECOMMENDATIONS

The Multnomah County Medical Examiner's Office is housed together with the State Medical

Examiner's Office and the Clackamas County Medical Examiner's Office at one location in

Clackamas, Oregon.  *Id.*

Multnomah County is governed by a Charter which provides that the Chair of the Board

of County Commissioners is the chief executive officer and the personnel officer of Multnomah

County.  Short Decl. (docket #74), ¶ 3; Exhibit 2.  The Chair delegates certain personnel

responsibilities to various managers and has delegated the authority to hire and fire personnel to

Schrunk.  Stewart Decl., ¶ 5.

Around November 6, 2006, in the exercise of his duties as Chief Deputy Medical

Examiner, Boggs brought to the attention of Jo'ey Stewart ("Stewart"), Schrunk's Executive

Assistant, a concern about misconduct by one of his subordinates, Brian Applegate

("Applegate"), a deputy medical examiner.   Stewart Decl.,  ¶¶ 1, 32.  Specifically, Boggs was

concerned that Applegate had used the Law Enforcement Data System ("LEDS") to look up a

local newscaster, Amy Frazier, for other than business purposes.  *Id* at ¶ 32.  LEDS contains

criminal justice records and other sensitive information about individuals and is subject to

administrative and database user rules that prohibit its use for personal purposes.  Schrunk Aff.,

¶¶ 8-9.  If Boggs was correct that Applegate did not have a professional purpose for looking up

Ms. Frazier's information, the use would constitute a personal use.  Stewart Decl., ¶ 32.  Any

such personal use of LEDS is inappropriate and violates the District Attorney's Office Policy

Manual rules as well as the LEDS contract.  *Id*; Brischetto Aff., Exhibit I, p. 16.  Therefore,

Boggs worked with Stewart and Jim Younger from Multnomah County Labor Relations to begin

an investigation into possible misconduct by Applegate.  Stewart Decl., ¶ 32.  During the course

5 - FINDINGS AND RECOMMENDATIONS

of the investigation, Applegate accused Boggs of also misusing LEDS by looking up a childhood bully of Applegate's, which Boggs denied. *Id*; Von Ter Stegge Aff., Exhibit C., pp. 2-3. Based on Boggs' response, the District Attorney's office went forward with terminating Applegate for his misuse of LEDS on November 20, 2006. Stewart Decl., ¶ 32.

On November 28, 2006, Bryan Lally of AFSCME Local 88 asked the District Attorney's office to conduct an audit of Boggs' LEDS use for the past three or four years in the Multnomah County Medical Examiner's office. *Id* at ¶ 33. The District Attorney's office decided to audit the other AFSCME Local 88 employees of the Medical Examiner's Office based on Applegate's claim. *Id*. Just before the audit, Boggs admitted to Stewart that he used LEDS to look up his wife a couple of times. *Id* at ¶ 34. Stewart responded that had it been her, Schrunk would have fired her. *Id*.

During the audit, Stewart and Younger interviewed Boggs who denied using LEDS for personal purposes other than to look up his wife. Von Ter Stegge Aff., Exhibit F. However, the audit revealed that Boggs had in fact used LEDS for non-business purposes on many occasions, including reviewing information about his brother, Steven Boggs; Shannon Lee Lomalino; his brother-in-law, Cameron Gray; his wife, Shari Gray; his sister-in-law, Karen Gray; Roger, Carol and Dr. Gunson; Peter Aviolotis and Glynis Gaither; and numerous county employees in the Medical Examiner's office. Stewart Decl., ¶ 34 & Exhibit 4. On December 20, 2006, when Stewart and Younger presented Boggs with a printout of his LEDS queries, Boggs recalled running a number of individuals other than his wife for personal purposes and his reasons for doing so. Von Ter Stegge Aff., Exhibit G.

After concluding the audit, Stewart prepared a written report dated December 18, 2006, of her findings which she provided to Schrunk.  Brischetto Aff., Exhibit I, pp. 2-5.  This report recommended the immediate dismissal of Boggs.  *Id* at 5.  Schrunk decided to terminate Boggs because he had lied in the course of the Applegate investigation that he had initiated on the basis of the same misconduct in which he had engaged.  Schrunk Aff., ¶ 6.  Schrunk informed Dr. Gunson of his intention to terminate Boggs.  Brischetto Supp. Aff., Exhibit 4 ("Gunson Depo."), p. 78.  Because Dr. Gunson did not want Schrunk to terminate Boggs, she asked him to reconsider.  *Id* at 78-80.  Despite Dr. Gunson's disapproval, Schrunk met with Boggs on January 5, 2007, and asked for his resignation.  Schrunk Aff., ¶¶ 5-6.  Boggs complied and resigned effective February 5, 2007, which Schrunk accepted.   Brischetto Aff., Exhibits K &  L.  Schrunk did not provide Boggs with an opportunity to read Stewart's report prior to his termination or with notice of any right to a hearing concerning the statements made about him in the report.  Boggs Decl., ¶¶ 6, 7.  Had Schrunk or Multnomah County informed Boggs that he had a right to a hearing, he would have requested such a hearing.  *Id* at 8.  Boggs was placed on administrative leave so that his last day on the job was January 5, 2007.  Stewart Decl., ¶ 37 & Exhibit 5.  Boggs' salary at the time of his resignation was $68,103.  *Id* at ¶ 26.

By letter dated February 5, 2007, Boggs' attorney provided notice that Boggs intended to pursue a tort claim against Multnomah County and Schrunk and that he revoked his resignation.  Brischetto Aff., Exhibit M.  Neither Multnomah County nor Schrunk contacted Boggs regarding the revocation of his resignation.  Boggs Decl., ¶ 5.

///

///

On February 6, 2007, Boggs began work at the Community Blood Center/Community Tissue Services as a Recovery Coordinator.  Boggs Depo., pp. 2, 4.  He was hired for that job some time prior to February 6, 2007.  *Id*.  In August 2007, Boggs was promoted to Director, for which he was given a pay increase to $75,000.  *Id* at 2, 5.  Boggs has not attempted to get a job as a medical examiner for any other county.  *Id* at 7.

On February 23 and May 22, 2007, the District Attorney's office received public records requests from the *Portland Tribune* and *The Oregonian*, respectively.  *Id*, Exhibit 6.  The District Attorney's office provided the requested documents on May 30, 2007.  *Id*, Exhibit 7.  On May 31, 2007, an article appeared in *The Oregonian* titled "Morgue workers misused data" which repeated the charges made as a result of Stewart's investigations.  *Id*.  Boggs read the article that same day and also heard a radio report containing references to him similar to those in *The Oregonian* article.  Boggs Decl., ¶ 10.  This was the first time that he learned of the specific statements made about him in the report.  *Id* at ¶ 7.  Based on this publication, Boggs believes that he could not obtain employment as a death investigator.  *Id* at ¶ 11.

## ANALYSIS

As noted above, this case was removed to this court after Boggs amended his pleadings to include a claim under § 1983.  The Fifth Claim is the sole basis of federal court jurisdiction.  Because this case involves complicated issues of interpretation of state statutes, remand to state court may well be in order should the federal claim founder.  Thus, this court first examines whether any portion of Boggs' due process claim survives summary judgment.  As explained below, this court concludes that Schrunk is entitled to summary judgment against the Fifth Claim

based on his lack of personal participation in the underlying events, but that issues of fact

preclude the entry of summary judgment in favor of Multnomah County on that claim.

## I. <u>Due Process Claim</u>

In his Fifth Claim, Boggs alleges that Schrunk and Multnomah County violated his due

process rights under the Fourteenth Amendment to the United States Constitution by depriving

him of his liberty interest in pursuing his chosen occupation without providing due process of

law.  First Amended Complaint, ¶ 40.  Specifically, he alleges that after his forced termination,

Multnomah County, in response to a public records request, disclosed the Conclusions and

Recommendations section of Stewart's December 18, 2006 investigation report concerning his

improper use of LEDS and his alleged lack of truthfulness during the investigation of Applegate.

After this allegedly false and stigmatizing information was published in an article by *The

Oregonian* on May 31, 2007, Boggs was not given the opportunity for a name-clearing hearing.

An individual has a protectable liberty interest "when government action stigmatizes the

individual, effectively 'foreclos[ing] his freedom to take advantage of other employment

opportunities." *Roth v. Veteran's Admin. of Gov't of U.S.*, 856 F2d 1401, 1410 (9th Cir 1988)

(citations omitted).  To establish a deprivation of a liberty interest, a plaintiff must prove both

"the public disclosure of a stigmatizing statement by the government, the accuracy of which is

contested, *plus* the denial of 'some more tangible interest [] such as employment,' or the

alteration of a right or status recognized by state law." *Ulrich v. City and County of San

Francisco*, 308 F3d 968, 982 (9th Cir 2002), quoting *Paul v. Davis*, 424 US 693, 701 (1976).

This has become known as the "stigma plus" test.  *R.J. Reynolds Tobacco Co. v. Shewry*, 423

F3d 906, 925 (9th Cir 2005), citing *Paul*, 424 US at 701.

Thus, Boggs is entitled under the Fourteenth Amendment to notice and an opportunity to be heard if his termination from employment or decision not to rehire him was accompanied by "any charge against him that might seriously damage his standing and associations in his community" or "imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." *Bd. of Regents of State Colleges v. Roth*, 408 US 564, 573 (1972). "The purpose of such notice and hearing is to provide the person an opportunity to clear his name. Once a person has cleared his name at a hearing, his employer, of course, may remain free to deny him future employment for other reasons." *Id* at 573, n12.

Defendants contend that Boggs' due process claim fails because the publicized statements were not made in connection with a termination, have no temporal nexus to Boggs' resignation, and were not false and defamatory. Schrunk also argues that he was not sufficiently involved to be held liable under § 1983 and is entitled to qualified immunity. As explained below, this court agrees that Schrunk is not liable, but finds that the due process claim otherwise survives summary judgment.

**A.  Schrunk**

**1.  Insufficient Personal Involvment**

A person deprives another "of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that *causes* the deprivation of which [the plaintiff complains]." *Johnson v. Duffy,* 588 F2d 740, 743 (9th Cir 1978) (emphasis added). "The inquiry into causation must be individualized and focused on the duties and responsibilities of each individual

defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844 F2d 628, 633 (9th Cir 1988) (citations omitted).

Schrunk does not dispute that he personally participated in the decisions to terminate and not rehire Boggs. However, he disputes that he was involved in any way in the public disclosure of the statements that underlie Boggs' due process claim. Schrunk did not draft the investigation report concerning Boggs. Schrunk Aff., ¶ 10. He was aware at some point that a public records request had come into his office regarding Boggs. *Id* at ¶ 11. He told his senior staff that he wanted to handle the request consistent with Oregon law and his office's procedures for releasing documents and to have the Multnomah County Attorney's Office look at the request before making any decisions on the matter. *Id*. He did not personally authorize the release of the documents which was done by others in his office. *Id* at ¶ 12. John Hoover, the Deputy District Attorney responsible for reviewing and deciding whether to comply with public records requests, made the decision to release the records after consulting with senior management and the Multnomah County Attorney's Office. Hoover Aff., ¶¶ 3, 7-9. Schrunk did not direct him to release, or indicate whether he should release, the requested records. *Id* at 9-10.

Schrunk's participation in the public disclosure of the allegedly defamatory charges concerning Boggs was limited to directing his subordinate to comply with Oregon law and to first consult with the Multnomah County Attorney's Office. Thus, at best, his liability must be premised in his capacity as a supervisor. Supervisory liability under § 1983 may not be based on *respondeat superior*, but only on the supervisor's own wrongful acts or omissions. *Monell v. Dep't of Soc. Servs.*, 436 US 658, 694 n58 (1978). Applying this rule, "[s]upervisors can be held liable for: 1) their own culpable action or inaction in the training, supervision, or control of

11 - FINDINGS AND RECOMMENDATIONS

subordinates; 2) their acquiescence in the constitutional deprivation of which a complaint is made; or 3) for conduct that showed a reckless or callous indifference to the rights of others." *Cunningham v. Gates*, 229 F3d 1271, 1292 (9th Cir 2000) (citation omitted). Encouraging Hoover, the person who released the report, to comply with the law after consulting with Multnomah County does not fall into any of these three categories.

Under Oregon's public records statute, Schrunk, as the District Attorney and custodian of the public records, had the authority to deny the public records request on the grounds that litigation was filed or likely or that the documents were personnel discipline actions if he believed that those exceptions applied. ORS 192.430 & 192.501(1) & (12). Also, as the District Attorney, Schrunk could have directed Multnomah County to release records unless it objected to the disclosure by filing its objection in court. ORS 192.450(2) & 192.460(1)(a). However, he took neither action. Instead, he deferred to Hoover in consultation with the Multnomah County Attorney. He was not involved in legal discussions with Multnomah County and did not dictate a particular outcome. Although Schrunk was aware of the charges against Boggs contained in the December 2006 investigation report, there is no evidence that he knew the report was exempt from disclosure under Oregon's public records law but nonetheless authorized its disclosure in order to deprive Boggs of his constitutional right. The fact that Multnomah County made no objection to its disclosure gives rise to the inference that a reasonable person could conclude that the records were not exempt from disclosure under Oregon law. Thus, the necessary causal link is missing in order to impose personal liability on Schrunk.

///

///

## 2. **Qualified Immunity**

Because Schrunk's participation is too minimal to hold him personally liable under § 1983 for a denial of Boggs' due process rights, this court need not address Schrunk's alternative argument that he is entitled to qualified immunity.

### B. **No Discharge**

Defendants argue that Boggs cannot prove a denial of any liberty interest because he voluntarily resigned his employment. This argument must be rejected.

In *Roth*, 408 US at 573, the Supreme Court made clear that a discharge includes not only formal decisions to discharge, but also a decision not to rehire. In *Ulrich*, the Ninth Circuit applied *Roth* to a liberty interest claim by a plaintiff who resigned after receiving notice that he was being investigated for professional incompetence and then two weeks later submitted a letter rescinding his resignation. The court held that the employer's decision to decline to honor the revocation of the resignation was a denial of rehire sufficient to invoke procedural due process protections.

Similarly here, Boggs' attorney mailed a letter to Schrunk and the Multnomah County Attorney revoking Boggs' resignation because it was coerced through unauthorized conduct. Under *Roth* and *Ulrich*, the refusal to accept Boggs' revocation of his resignation was a non-retention decision entitling him to due process protections.

Alternatively, Schrunk made an irrevocable decision to terminate Boggs by giving Boggs the choice of being terminated or resigning. At the very least, this creates an issue of fact as to whether Boggs was discharged or resigned.

///

C. **Temporal Nexus**

Defendants also argue that an insufficient temporal nexus supports Boggs' due process claim. The allegedly stigmatizing charges are contained in the December 18, 2006 report issued 18 days prior to Boggs' termination. Excerpts of that report were subsequently published in May 2007 after Multnomah County refused to rehire Boggs. Defendants contend that the four month delay between the refusal to rehire Boggs and the defamatory publication breaks the temporal nexus sufficient to claim a denial of a liberty interest.

A due process claim "does not require a strict temporal link between the defamation and the nonrenewal or discharge; rather, the defamatory statement must be 'so closely related to discharge from employment that the discharge itself may become stigmatizing in the public eye." *Ulrich*, 308 F3d at 983, quoting *Campanelli v. Bockrath*, 100 F3d 1476, 1482 (9th Cir 1996). However, the timing of publicizing the alleged defamation is a relevant factor in assessing the existence of a liberty interest. As the Ninth Circuit explained:

> In rejecting defendants' proposed bright-line rule, we do not say that the timing of an employer's statements is of no consequence at all. Common sense and the reasoning of *Paul* dictate that there must be some temporal nexus between the employer's statements and the termination. At some point, defamatory statements may become too remote in time from the termination to be considered made "in the course of the termination."

*Campanelli*, 100 F3d at 1483 (citations omitted).

As support, the Ninth Circuit cites cases from two other circuits. In *Hadley v. Du Page County*, 715 F2d 1238, 1247 (7th Cir 1983), *cert denied*, 465 US 1006 (1984), the Seventh Circuit held that a statement to the press six days after the plaintiff's termination was "at the time of" termination, but that a statement published two years later "does not give rise to a liberty

interest since the requisite nexus between the allegedly stigmatizing statement and the date of Hadley's dismissal is nonexistent, *i.e.*, it was too remote in time to meet the stigma plus test." Similarly, the Eleventh Circuit in *Ray v. Tennessee Valley Auth.*, 677 F2d 818, 824 (11th Cir 1982), *cert denied*, 459 US 1147 (1983), held that a six year lapse is long enough to sever the temporal nexus of statements to termination of the plaintiff's employment.

In contrast, the allegations in *Campenelli* survived a motion to dismiss claim because the publication by defendants made within seven to nine days after the plaintiff's termination date "did not attentuate the temporal connection between the statements and the termination." *Campenelli*, 100 F3d at 1483.  Relying on *Campenelli*, the Ninth Circuit in *Ulrich* held that a stigmatizing statement made five days after the termination of the plaintiff's staff privileges was closely linked in time to the decision not to rehire him to satisfy the "stigma plus" test.  *Also see Patterson v. City of Utica*, 370 F3d 322, 335 (2nd Cir 2004) (holding that the proximity requirement between stigma and plus was met when some statements were made within one week of plaintiff's termination in direct response to requests for reasons for plaintiff's termination).

The four month gap in this case falls between the lengthy two and six year gaps in *Hadley* and *Ray* and the short gaps of about a week in *Campenelli* and *Ulrich*.  Some courts have found that gaps of several weeks or months were sufficiently attentuated, but in those cases the defamatory statements were not explicitly connected to the discharge.  *See, e.g., Brennan v. Hendrigan*, 888 F2d 189, 196 (1st Cir 1989) (articles appearing two months after discharge held not connected with plaintiff's dismissal when no evidence existed that defendants made any statements to the press); *Ewers v. Board of County Com'rs of Curry County*, 802 F2d 1242, 1248

15 - FINDINGS AND RECOMMENDATIONS

(10th Cir 1986), *cert denied*, 484 US 1008 (1988) (allegedly defamatory statement was not made in connection with decision to abolish plaintiff's position when made three weeks after employment decision and did not in any way indicate that it was connected to that decision). In contrast, the statements at issue here were made by defendants to the press and directly addressed the decision for Boggs' termination.

Even when the statements were clearly connected to the termination, some courts have found the temporal nexus lacking for statements made several months after the termination. *See, e.g., D'Allessandro v. City of Albany*, 2008 WL 544701 (NDNY Feb. 26, 2008) (statement to the press almost four months after plaintiff's termination explaining why he had been fired lacked concurrent temporal link); *Malapanis v. Regan*, 340 F Supp2d 184, 194 (D Conn 2004) (necessary temporal link lacking for allegedly defamatory statements labeling the plaintiffs as "non-responsible bidders" was made at a press conference approximately three months after termination of the contract); *Cipolla v. County of Rensselaer*, 129 F Supp2d 436, 449 (NDNY 2001) (holding that statements made six months after plaintiff's termination lacked the necessary nexus). However, each of those cases relied on *Martz v. Incorporated Village of Valley Stream*, 22 F3d 26, 32 (2nd Cir 1994), which held that a statement published five months after the plaintiff's termination was not made in the course of dismissal. *Martz* also noted that the purported malpractice referenced in the statement had just recently come to the speaker's attention, indicating that it could not have been a factor in the decision not to reappoint her.

Unlike *Martz*, the newspaper article about Boggs reported on statements that had been made concurrently with and caused his termination. In other words, the post-termination statements were pre-termination statements published in a newspaper at a later time. There can

be no question that they related to his termination.  The only question is whether they are "too remote in time from the termination to be considered made 'in the course of the termination.'" *Campanelli*, 100 F3d at 1483.  If the delay were several years, the publication clearly would be too remote in time.  However, based on a delay of four months, a jury could reasonably conclude that Bogg's loss of employment was accompanied by public disclosure of a charge that might seriously damage his standing and associations in the community sufficient to trigger the due process right to a hearing.

Because the statements about Boggs were made after he filed this lawsuit, defendants also argue that they are not actionable, pointing to the citation by *Campenelli* of *Bishop v. Wood*, 426 US 341, 348-49 (1976) for the proposition that "post-litigation statements could not form the basis of a due process claim."  *Campanelli*, 100 F3d at 1483 n8.  However, *Bishop* did not hold that stigmatizing statements made after litigation is filed cannot form the basis of a due process claim.  Instead, it holds only that statements made in private or in the course of a judicial proceeding may not form the basis of a liberty interest claim.  In *Bishop*, the reasons for the plaintiff's termination were made orally to the plaintiff in private and repeated later in writing in answer to interrogatories in the course of a judicial proceeding.  Statements made in a judicial proceeding are privileged communications.  Here, in contrast, statements made about Boggs after litigation commenced were made to the press and not in court or in response to a discovery request.  Therefore, *Bishop* does not support defendants' argument.

///

///

///

17 - FINDINGS AND RECOMMENDATIONS

### D.  **Published Statements Not False and Defamatory**

Defendants contend that the statements in question were not defamatory or false.  Boggs

has identified as defamatory 11 statements in the investigation report prepared and released by

Schrunk's office.  Of these 11 statements, Boggs contests the accuracy of at least four charges,

namely that he:  (1) was untruthful; (2) applied standards of accountability to subordinates that

he did not apply to himself; (3) selectively chose employees he had personality conflicts to

discipline; and (4) retaliates against AFSCME Local 88 staff.  Brischetto Supp Aff., Exhibit A,

Boggs Decl., ¶ 9.

The December 2006 report claimed that Boggs "supervises by using a lesser standard of

accountability for himself than that of his subordinates; that he has selectively chosen employees

he has personality conflicts with to pursue disciplinary actions against; and been less than

truthful when providing information to us" and that "[t]here is also a real fear of retaliation from

Rob Boggs by the Medical Examiner's [AFSCME] Local 88 staff should he continue to

supervise them."  Brischetto Aff., Exhibit 14, p. 5.  The charge of dishonesty alone is sufficient

to implicate a liberty interest.  *Brady v. Gebbie*, 859 F2d 1543, 1553 (9th Cir 1988), *cert denied*,

489 US 1100 (1989).  Furthermore, the four charges read together lead to the reasonable

conclusion that, out of personal animosity, Boggs will lie in order to get employees fired.  Under

*Campanelli*, this is a sufficient charge of immorality to implicate a liberty interest.

In addition to his own testimony, Boggs has submitted evidence that these four charges

are false.  According to Dr. Gunson, Boggs did not supervise by using a lesser standard of

accountability for himself, selectively choose employees with whom he had personality conflicts

to pursue disciplinary action, or lie to get somebody fired.  Gunson Depo., pp. 79, 87-88.

Another physician employed in the State Medical Examiner's Office, who had an opportunity to observe Boggs' interaction with other employees for seven to eight years, witnessed nothing to support the charges made against Boggs.  Brishchetto Supp. Aff., Exhibit 3 (Young Decl.), ¶¶ 1-3. The union steward for AFSCME Local 88 employees also found Boggs to be truthful, fair in dealing with employees and a good manager.  Brischetto Supp. Aff., Exhibit 1 (Wise Decl.), ¶ 3. When Boggs attempted to increase the office's professionalism to meet standards for national accreditation, some employees resisted Boggs' authority and efforts.  *Id* at ¶ 4.  Applegate was one of those employees who was defiant, resisted authority and needed to be disciplined.  *Id* at ¶ 5; Gunson Depo., p. 79.

With respect to applying lesser standards of accountability, Boggs has submitted evidence that he and Applegate used the LEDS for different purposes.  Applegate may have used LEDS to stalk a female reporter.  Brishchetto Supp. Aff., Exhibit 7.  In contrast, according to Dr. Gunson, Boggs did not use LEDS for any malicious purpose, but was disciplined for the simple fact of using LEDS.  Gunson Depo., p. 82.

With respect to the employees' fear of retaliation by Boggs, Dr. Gunson surveyed about half of the employees shortly after Stewart's investigation who "were shocked that someone would think that."  Brischetto Aff., Exhibit S.

This evidence is sufficient to create issues of fact as to whether at least four of the statements in question were false.  Accordingly, defendants' argument that they are entitled to summary judgment on the basis that the published statements were not false and defamatory must be rejected.

///

19 - FINDINGS AND RECOMMENDATIONS

### E.  <u>Loss of Employment Opportunities</u>

Defendants' final argument with regard to the due process claim is that Boggs never lost any employment opportunities.  After being forced to resign his employment with Multnomah County on January 5, 2007, effective February 5, 2007, Boggs secured other employment and began working at his new job on February 6, 2007.  Because he quickly obtained another job and continued working after the publication of the allegedly stigmatizing charges, defendants contend that he was not effectively foreclosed from taking advantage of other employment opportunities.

However, Boggs was not able to secure another job in a medical examiner's office. Instead, he is currently the Director of the Community Blood Center/Community Tissue Services.  Boggs Depo., pp. 4, 23.  He claims that this is a different profession.

The record is not sufficiently developed at this point to determine whether Boggs has been foreclosed from his right to pursue his chosen occupation.  Due to factual disputes and an inadequate factual record, the resolution of this issue must await trial.

## II.  <u>Shrunk's Authority to Fire or Force Boggs to Resign</u>

Boggs' remaining claims, including his First Claim for declaratory relief, his Second and Third Claims for intentional interference with employment, and his Fourth Claim alleging failure to pay wages due and owing, all turn on one central point of dispute, namely whether Shrunk, as Multnomah County's District Attorney, had the authority to fire Boggs or to force him to resign. The parties cite a multitude of state statutes, county personnel policies, and other documents bearing on this issue.  Boggs contends that Dr. Gunson, the State Medical Examiner acting in her additional capacity as Multnomah County's District Medical Examiner, was the sole person with

the authority to fire him.  Defendants respond that Dr. Gunson was not duly appointed as

Multnomah County's District Medical Examiner, and even if she was properly appointed or must

be deemed to have been acting as the District Medical Examiner, she shares the authority to fire

deputy medical examiners with the Multnomah County District Attorney.  This court first turns

to the preliminary issue of Dr. Gunson's status as District Medical Examiner in January 2007.

### A.  Whether Dr. Gunson was Multnomah County's District Medical Examiner

#### 1.  Oregon's Death Investigation Statute

ORS Chapter 146 provides for a state death investigation program which consists of two

complimentary parts.  The first part includes the State Medical Examiner's office which is

administered by the State Medical Examiner Advisory Board.  ORS 146.015.  The State Medical

Examiner is a pathologist recommended by the State Medical Examiner Advisory Board and

appointed by the Superintendent of State Police.  ORS 146.015.  Dr. Gunson has served as the

Oregon State Medical Examiner since 1999.

The second part requires that "[i]n each county there shall be a medical examiner for the

purpose of investigating and certifying the cause and manner of deaths requiring investigation."

ORS 146.065(1).  The officer charged with investigating deaths is referred to as the "District

Medical Examiner."  The State Medical Examiner appoints each district medical examiner

subject to the approval of the appropriate board of commissioners.  If a county's district medical

examiner position is vacant, the county health officer temporarily acts as the county district

medical examiner in cooperation with the State Medical Examiner until the vacancy is filled.

ORS 146.065(3).  If both the district medical examiner and health officer positions are vacant,

the district attorney must temporarily act as the district medical examiner in cooperation with the

State Medical Examiner until the vacancy is filled.  ORS 146.065(4).  Counties can, with the approval of the State Medical Examiner Advisory Board and the commissioners of each county, form a single district medical examiner's office instead of each county having its own office.  ORS 146.065(5).

Boggs contends that Dr. Gunson was Multnomah County's District Medical Examiner at the time he was forced to resign in January 2007.  Defendants respond that Dr. Gunson was not approved by "the appropriate board or boards of commissioners" as required by ORS 146.065(2) and, therefore, was not Multnomah County's District Medical Examiner at the relevant time.  This argument is without merit.  As discussed below, Dr. Gunson was Multnomah County's District Medical Examiner at all relevant times, either due to Multnomah County's act of ratifying her informal appointment every year or due to defendants' admissions in this litigation.

Although defendants now seek to deny that Dr. Gunson was Multnomah County's District Medical Examiner, the record reveals that Multnomah County has allowed Dr. Gunson and her predecessors to act as Multnomah County's District Medical Examiners since 1971 without any apparent requirement that the appointment be formalized.  Lewman Aff., ¶¶ 3-4.  Moreover, there is no evidence in the record that, during that same time, any county health officer ever "temporarily act[ed] as medical examiner in cooperation with the State Medical Examiner until the [district medical examiner] position [was] filled" as would have been required under ORS 146.065(3) in the event of a vacancy in the position of Multnomah County's District Medical Examiner.  Nor is there any evidence that Multnomah County's District Attorney ever acted in that role due to vacancies of both the district medical examiner and county health officer positions as allowed by ORS 146.065(4).

///

Consistent with this evidence, Schrunk has admitted that Dr. Gunson served as Multnomah County's District Medical Examiner.  Defendant Michael D. Schrunk's Amended Answer and Affirmative Defenses to Plaintiff's Amended Complaint (docket #43), ¶ 4. Multnomah County did not make this same admission.  Defendant Multnomah County's Second Amended Answer and Affirmative Defenses to Plaintiff's Amended Complaint (docket #32) ("Multnomah County's Answer"), ¶ 4.  Nevertheless, Dr. Gunson states that she is Multnomah County's District Medical Examiner and that she hired Boggs as Chief Deputy Medical Examiner with Schrunk's approval.  Gunson Aff., ¶¶ 2-3.  Under ORS 146.085(1), any such hiring would have been done by the district medical examiner for the appropriate county, "subject to the approval of the district attorney and applicable civil service regulations."  Again, Multnomah County avoids any admission that Dr. Gunson was its District Medical Examiner as evidenced by this hiring, instead admitting only that "[e]ffective August 1, 2001, [Boggs] was appointed to the Chief Deputy Medical Examiner's Position as a regular employee."  Multnomah County's Answer, ¶ 7.  However, it its memorandum in support of its motion for summary judgment, Multnomah County states that "[t]here is no question that the District Medical Examiner, in this case, Karen Gunson, is employed by the State."  Multnomah County's Corrected Memorandum of Law in Support of Motion for Summary Judgment (docket #83), p. 10.  Finally, a letter dated June 11, 1997, signed by both Schrunk and Dr. Larry Lewman confirms that the State Medical Examiner acted as Multnomah County's District Medical Examiner.  Gunson Depo., Exhibit 63 ("The State Medical Examiner is also the Multnomah County Medical Examiner.").

The evidence supports only one conclusion: Dr. Gunson was (and is) acting as Multnomah County's District Medical Examiner. Defendants are bound to accept her as such by virtue of their past practices and/or admissions.

### B. Authority to Fire

This leaves the central point of contention, namely the authority of the Multnomah County District Attorney (Schrunk) to fire the Chief Deputy Medical Examiner (Boggs). The parties cite a host of statutes which in one way or another help to define the role of the district medical examiner and the district attorney *vis a vis* deputy medical examiners.

Boggs points out that the Multnomah County District Medical Examiner (Dr. Gunson) serves as the administrator of the district medical examiner's office and has the discretionary authority to employ such other personnel as necessary to operate the office. ORS 146.075 (2007). Furthermore, state law requires that "[a]ll expenses of equipping, maintaining and operating the district medical examiner's office . . . be paid by the county or counties of the district from funds budgeted for such purpose." ORS 146.075(2) (2007). Boggs then cites a variety of other authorities for the proposition that deputy medical examiners, despite their many badges of county employment and despite the fact that the district medical examiner's office is a part of the District Attorney's office for administrative purposes, are not subject to removal by the district attorney. Defendants respond that, whether or not Dr. Gunson did or is deemed to have held the position of the District Medical Examiner for Multnomah County, Schrunk nevertheless had the authority to fire Boggs.

After an exhaustive review of the relevant statutory and other authority, including

legislative history, this court concludes that the relevant Oregon statutes, read in context,

foreclose the reading proffered by Boggs.

### 1.  Legislative History Leading to Enactment of ORS 146.085 in 1973

The parties vehemently dispute whether ORS 146.085(1), read in its proper statutory and

administrative context, includes a grant of authority to a county district attorney to fire a deputy

medical examiner.  The historical context and legislative history of that provision has an

important bearing on the analysis.  Thus, this court first briefly delves into the legislative

changes affecting Oregon's death investigation program.

Prior to 1959, Oregon law required each county to have an elected coroner to investigate

any deaths in which criminal activity was suspected.  General Laws of Oregon, Coroners and

Criers, Chap. 14, Title VII, Sec. 996, p. 305 (Deady 1843-1872); General Laws of Oregon,

Officers – County, Chap. 41, Title II, Sec. 8, p. 692 (Deady 1843-1872).  In 1959, the legislature

abolished the office of coroner.  Or. Laws 1959, Ch. 628, Sec. 1.  In its place, the legislature

established the office of the "Chief Medical Investigator" (the precursor to the State Medical

Examiner) "within the agency headed by the State Board of Health," appointed by and subject to

removal "in the manner provided for the State Health Officer."  ORS 146.040 (1959).  At that

time, the statute had two separate sections, one for counties with a population of 400,000 persons

or more and a coroner elected or appointed prior to January 1, 1961 (ORS 146.105 - .400

(1959)), and one for counties with a population of fewer than 400,000 persons and in which the

office of a coroner elected or appointed prior to January 1, 1961, became vacant or in which the

coroner completed his term of office (ORS 146.410 - 980 (1959)).  If the office of the coroner

was vacant, or the coroner was unable to act or was absent, "any justice of the peace of the county [was] authorized and required to perform the duties . . . of the coroner." ORS 146.150(2) (1959).

After January 1, 1961, in those counties with a population fewer than 400,000 persons without coroners (or when the office of the coroner became vacant or the coroner completed the term of office), the statute mandated that the "county or district health officer shall be the county or district medical investigator for that county or district." ORS 146.420(1) (1959). The statute also specified that the "medical investigator shall appoint one or more peace officers as his deputy or deputies to assist him." ORS 146.420(2) (1959).

Effective January 1, 1961, for counties of fewer than 400,000 persons, Oregon's death investigation statute, transferred the duties of county coroners to the county's district medical investigator. ORS 146.410 (Note, 1959 Replacement Part). At that time, ORS 146.420(1) (1959 Replacement Part) mandated that the "county or district health officer shall be the county or district medical investigator for that county or district," and ORS 146.420(2) (1959 Replacement Part) required the county or district medical investigator to appoint "one or more peace officers as his deputy or deputies to assist him." The medical investigator was required to report any death requiring investigation to the district attorney of the county in which the death occurred. ORS 146.430 (1959 Replacement Part).

What is evident from reading these provisions is the quandry of the the legislature in trying to craft a state-wide death investigation program. Funding decisions had to take into account both local and state-wide program needs. The deaths that required investigation

oftentimes required the involvement of the district attorney's office and law enforcement personnel.

In 1965, Oregon's death investigation statute was again amended, adding a new section creating a "Deputy Chief Medical Investigator" in Multnomah County.  The "Deputy Chief Medical Investigator," (later renamed the "District Medical Examiner") was appointed by the Chief Medical Investigator" (later renamed the "State Medical Examiner") and was "the administrative head of the office of the Deputy Chief Medical Investigator" which was also established "within the agency headed by the State Board of Health."  ORS 146.310(1) & (3) (1965).  This provision specified that it "does not become operative until the office of the Multnomah County Coroner becomes vacant or until the incumbent completes his current term of office in January 1969, whichever is earlier."  ORS 146.310 (Note, 1965 Replacement Part, citing Or. Laws 1965, Ch. 221, Sec. 29).  "Subject to the applicable provisions of any county civil service law," the Deputy Chief Medical Investigator had discretionary authority "to appoint one or more deputy medical investigators to assist him in carrying out the functions of his office and may employ such other personnel as he deems necessary to operate his office." ORS 146.340 (1965).  The compensation of the Deputy Chief Medical Examiner was to be paid by the state, while all other expenses of equipping, maintaining and operating the office of the Deputy Chief Medical Investigator were to be paid by the county.  ORS 136.350(1) & (2) (1965).

In 1973, the Oregon legislature substantially amended the death investigation statute in several respects, including adding a new provision that is central to this case.  One topic of discussion was the need to amend ORS 146.420(2) (1971), which at that time provided that the

"medical investigator may appoint one or more deputies to assist him" and that "[a]n appointee

may be a peace officer."  The legislative record from 1973 reveals that the proposed amendments

originally included a "provision that automatically made the policeman a deputy medical

investigator."  Legislative History, Attachment 1, p. 27 of 73[1] (Hearing on House Bill 2279,

Senate Judiciary Committee (May 7, 1973)).  However, "[t]hat section was removed and a

provision was made in which the district medical examiner appoints a qualified deputy medical

examiner including the sheriff and a member of the state police."  *Id*.  The legislative history

indicates that the purpose of the amendment (codified as ORS 146.085(1)) was to require county

district medical examiners to appoint as deputy medical examiners at least two police force

members, "including the sheriff or a deputy sheriff and a member of the Oregon State Police."

*Id* at 24 of 73 (Hearing on House Bill 2279, House Judiciary Committee Minutes, (April 3,

1973)).  The discussion focused on the need for local law enforcement to have concurrent

jurisdiction over death investigations if and when necessary: "there were instances, particularly

when a crime is involved, when the medical examiner cannot proceed administratively and there

must be concurrent jurisdiction with the district attorney."  *Id* at 13 of 73 (Hearing on House Bill

2279, House Judiciary Committee Minutes (March 5, 1973)).  Previous language which gave the

district medical examiner discretion to appoint deputy medical examiners was considered

insufficient:

> [W]hat is proposed by the amendment is a departure from the
> present system, the law in which, ORS 146.420(2) provides that
> the medical investigator <u>may</u> appoint a deputy medical investigator

---

[1]  On June 24, 2008, defendants electronically filed a letter and an accompanying attachment including the legislative history available on ORS 146.075 and ORS 146.085 (docket #109).  For ease of reference, citations are to the attachment and to the relevant committee and date of the entries.

> and that person <u>may</u> be a peace officer. . . . [T]he purpose of the amendment is to make clear the need for peace officers in the system, . . . for two reasons.  First, the line of investigation is typically begun by police; and second, the point has been reached where <u>"may"</u> is simply insufficient as a direction on this subject, since there is a real need to have involvement on the part of the local law enforcement group. . . . [T]he amendment would provide that at least a sheriff and deputy sheriff <u>shall</u> be appointed, as well as a member of the Oregon State Police for that county, and any other peace officer may be appointed.

*Id*, p. 12 of 73 (emphasis in original).

For purposes of this case, the important point is that the final product of the 1973 amendments makes clear that the district attorney has a decisive role in the employment of deputy medical examiners.  The appointment of deputy medical examiners is subject to the approval of the district attorney.  ORS 146.085(1) (2007).  The district attorney, along with the district medical examiner, sets the qualifications for deputy medical examiners.  ORS 146.085(2) (2007).  Deputy medical examiners investigate deaths "subject to the control ***and*** direction of the district medical examiner ***or*** the district attorney."  ORS 146.085(4) (2007) (emphasis added).

What is equally important about these amendments is what is ***not*** in them.  In enacting these provisions, the legislature could easily have included a provision specifying that the district attorney had approval authority only over the appointment of certain deputy medical examiners.  It did not do so.[2]  The legislature could also have included a provision stating that the district medical examiner had sole authority to establish qualifications for deputy medical examiners.  Again, the legislature did not do so.  The legislature could also have made deputy medical

---

[2] Given the legislative history of this provision, it could be argued that the approval by district attorneys relates only to appointments of sheriffs and/or police officers as deputy medical examiners.  Nevertheless, the legislation does not restrict the approval authority of the district attorney in that way.  Instead, the district attorney has approval authority over all appointments of deputy medical examiners.  Consistent with this lack of limitation, Boggs' appointment was approved by Schrunk.  Gunson Decl., ¶ 3.

29 - FINDINGS AND RECOMMENDATIONS

examiners subject only to the control and direction of the district medical examiner and the state

medical examiner, but not the district attorney. Again, that is not what the legislature did.

Instead, the legislature expressly chose both the district attorney and the district medical

examiner to set the qualifications for, approve the appointment of, **and** maintain control and

direction over the deputy medical examiners, who were in turn provided compensation (and

benefits) by the county in which they work.

Moreover, these provisions stand in stark contrast to another provision. ORS 146.065(2)

(2007) specifies that "[e]ach district medical examiner shall be appointed by the State Medical

Examiner with approval of the appropriate board or boards of commissioners *and may be*

*discharged by the State Medical Examiner without such approval*." (emphasis added). This

provision indicates that, had the legislature wanted to strip the district attorney of ongoing

authority over the appointment of deputy medical examiners, it would have explicitly included

language to that effect. In sum, the only reasonable interpretation of these provisions, read in

context, is that, without the continuing approval of his or her qualifications and job performance

by the district attorney, a deputy medical examiner may not be employed in a district medical

examiner's office.

## 2. Administrative Placement of the District Medical Examiner's Office

Another prominent issue in the parties' submissions is how the positions of a district

medical examiner and deputy medical examiners figure into Multnomah County's budget and

agency oversight. This issue is cited as one important aspect of understanding the employment

relationship (or lack thereof) between the district attorney and deputy medical examiners.

Oregon's State Medical Examiner's office currently operates within the Department of State Police and reports to both the Department of State Police and State Board of Health. ORS 146.025(5)-(6) (2007); ORS 146.035(1) (2007).  Each Oregon county, either individually, or in cooperation with other counties, is required to have its own district medical examiner "for the purpose of investigating and certifying the cause and manner of deaths requiring investigation."  ORS 146.065(1).

As noted above, the county death investigation programs originally operated as budget items under the auspices of the Health Division.  The county death investigation programs historically operated independently, despite being pigeonholed under the Health Division for administrative and budgetary purposes:

> Dr. Brady [former State Medical Examiner] said his direct administrative responsibility is to his boss, Cornelius Bateson of the Health Division . . . .  Dr. Brady . . . could see few instances where [a conflict might arise] since the [death] investigation program is attached to the Health Division for only 'lights, heat and water", quoting from Mr. Bateson.  He could see where a difference of opinion may arise over a budget matter, but little else.

Legislative History, Attachment 1, p. 7 of 73 (Hearing on House Bill 2279, House Judiciary Committee (March 5, 1973)).

> [Jack Frost of the Oregon District Attorney's Association] said the functions of a medical examiner were also separate under present law, but were often covered in the payment to the county health officer, and he expressed his belief that separate budgeting would point out the difference between the two functions.

*Id* at 11 of 73.[3]

In 1995, the Oregon legislature transferred the State Medical Examiner's office out of the

Health Division and into the Department of State Police.  Oregon Laws 1995, Ch. 744, Sec. 8,

p. 2295.  A few years later, in 1997 or 1998, apparently due to a longstanding disagreement over

the level of supervision that could or should be exercised by the Multnomah County Health

Department doctors over the forensic pathologists in the Multnomah County Medical

Examiner's Office (Schrunk Depo., pp. 8-9), the budget for the Multnomah County District

Medical Examiner's office was placed under the Multnomah County District Attorney's office.

In mid-June 1997, after concerns were expressed over that arrangement, Schrunk and Dr. Larry

Lewman (then the State Medical Examiner), issued a joint response in a letter to Beverly Stein,

the Chair of the Multnomah County Board of Commissioners.  Short Decl. (docket #74),  Exhibit

23.  They expressed that their goal was "to retain the independence of the two offices" and

committed to "having the Medical Examiner take on a 'dotted line' relationship to the District

Attorney's Office."  Further explaining what they contemplated, they stated:

> This means the County Medical Examiner's Office will continue to
> report to and take direction from the State Medical Examiner.
> Furthermore, they will continue to process their own payroll,
> accounts payable and other administrative functions.  The District
> Attorney's Office will provide administrative and managerial
> assistance when necessary.  It is understood that in no way will
> there be a substantive review of any finding by a medical
> examiner.
> If disputes arise between the two offices, it is our intent that we
> first try to resolve them by having the Medical Examiner and the
> District Attorney meet to resolve the problem.  If we are unable to

---

[3] Frost's suggestion that separate budgeting should be required in order to reflect this difference in function appears to have made its way into the statute with regard to those cases where one person was serving a dual role:  "When a district medical examiner also serves as county health officer, the county shall separately budget the compensation and expenses to be paid for medical examiner's duties."  ORS 146.075(3).

> resolve the conflict in this manner, we will bring the matter
> forward and discuss it with the County Chair.

*Id.*

Boggs contends that this "letter agreement" precludes the district attorney from making employment decisions concerning deputy medical examiners without the express approval of the district medical examiner.  However, this letter in no way countermands the statutory authority just discussed.  Moreover, the letter itself indicates that the "dotted line" the district attorney is not to cross has nothing to do with personnel decisions.  Instead, it has to do with conducting a "substantive review" of the "findings" of medical examiners made during the course of death investigations.  This type of "dotted line" is clearly necessary to protect the integrity and independence of any death investigation in the event it becomes the basis for a criminal prosecution.  In contrast to the prohibition on that kind of involvement, the letter contemplates that the district attorney "will provide administrative *and managerial* assistance *when necessary*."  *Id* (emphasis added).  In this case, Shrunk decided that it was necessary to step into his managerial shoes and fire Boggs.  The letter in no way undermines the statutory authority he had to do so.  While the final paragraph of the letter might be read to provide a suggestion as to a "dispute resolution" process, it is not at all clear that a managerial decision that on-the-job conduct merited termination is the kind of "dispute" that the parties agreed to take before the County Chair and, in any event, there is no limitation placed on the action that could be taken by either side after they "discuss[ed] it with the County Chair."  Accordingly, the letter provides no basis for placing the kind of limitations on the district attorney's authority that Boggs advocates.

///

33 - FINDINGS AND RECOMMENDATIONS

### 3. __Badges of County Employment and Overlay of County Personnel Rules__

Apart from the death investigation statute, the parties also dispute the applicability and interpretation of various other statutes and personnel rules. Boggs contends that he was appointed by the district medical examiner, reported to the district medical examiner, had no employment relationship with the County Chair under the County Charter, had no employment relationship with the district attorney as an elected official, and was subject to termination only by the district medical examiner. However, this court concludes that Boggs too narrowly interprets the statutory powers granted the district attorney and the role of the county personnel policy.

The statutes authorizing the county death investigation programs repeatedly defer to county personnel policies and civil service laws. The appointment of deputy medical examiners is expressly "subject to . . . applicable civil service regulations," ORS 146.085(1) (2007), and any employment by the district medical examiner is likewise subject "to applicable provisions of a county personnel policy or civil service regulations." ORS 146.075(1). When he applied for the position as Chief Deputy Medical Examiner, Boggs did so on a Multnomah County employment application and was interviewed by a panel including Multnomah County employees. Short Decl. (docket #74), ¶¶ 6-7, Exhibits 8-9. Once hired, he was paid by Multnomah County pursuant to ORS 146.075. He received yearly Multnomah County merit increases and cost of living adjustments, accrued sick and vacation leave in the amounts provided to all Multnomah County employees, and enjoyed a variety of other benefits available to Multnomah County employees. Despite all of these badges of County employment and the undisputed evidence that the District Medical Examiner's office was "technically" placed

administratively (and budgetarily) under the umbrella of the Multnomah County District

Attorney's office, Boggs denies his chain of command includes the District Attorney.  However,

his efforts to avoid the clear implication of the various personnel provisions he cites is

unavailing.

From its inception, Multnomah County classified the Chief Deputy Medical Examiner

position as an executive, unclassified position which [r]eceives direction from the District

Attorney and the Oregon State Medical Examiner"  Graves Decl., Exhibit 10, pp. 1, 3.  The

Multnomah County Personnel Rules define District Attorney Executive Staff as "[e]mployees in

positions that report directly to and serve at the pleasure of the District Attorney" and notes that

"[t]hese employees have the same rights and benefits as county elected officials' staff."

Brischetto Aff., Exhibit N, p. 6.

Despite Multnomah County's classification of the Chief Deputy Medical Examiner

position as an executive position within the District Attorney's office, Boggs argues that he did

not meet the definition of those within the District Attorney's Executive Staff because he neither

reported directly to nor served at Schrunk's pleasure.  It may well be the case that Boggs' day-to-

day reporting was to Dr. Gunson and that the District Attorney generally steered clear of

exercising supervisory authority over employees in the District Medical Examiner's office.

However, again, the District Attorney's voluntary "hands off" management style does not

undermine the fair reading of the statutes which provides supervisory authority over deputy

medical examiners.  Executive employees of the District Attorney's office "serve at the pleasure

of the [District Attorney] and may be dismissed at any time."  Multnomah County Personnel

Rules, § 4-70-030.  As a member of the "executive staff" of the District Attorney's office, Boggs was subject to summary dismissal.

The legislature has consistently required that the costs of operating the state death investigation program be partially borne by the state and partially borne by the counties in which they operate, with more costs shifting to the counties over time.  *See* ORS 146.580(2) (1959) (expenses of investigating deaths by coroner paid by the county, except for one-half of any post-mortem examination paid by the state); ORS 146.350 (1965) (salary of Deputy Chief Medical Investigator paid by the state; all other expenses of operating office of Deputy Chief Medical Investigator paid by the county); ORS 146.075 (2007) (all expenses of operating the district medical examiner's office, including the compensation of the district medical examiner and assistant district medical examiners paid by the county).  Not surprisingly, in exchange for imposing this financial responsibility on the counties, the related statutes also give considerable say to county governments in choosing the individuals employed in their respective district medical examiner offices.  District medical examiner appointments are subject to "approval of the appropriate board or boards of commissioners."  ORS 146.065(2) (2007).  If the district medical examiner position is vacant, county officials (county health officer, then district attorney) temporarily act as the district medical examiner.  ORS 146.065(3) and (4) (2007). District medical examiner employment decisions are expressly "[s]ubject to applicable provisions of a county personnel policy or civil service law."  ORS 146.075(1) (2007).

As previously noted, when the death investigation statute was amended in 1973, the legislature added ORS 146.085.  In enacting that new provision, the legislature mandated the appointment of a minimum of two law enforcement officers, including either the sheriff or a

deputy sheriff and a member of the Oregon State Police, as deputy medical examiners in each county.  It also gave the district attorney decisive involvement in the employment of deputy medical examiners.  The district medical examiner and the district attorney establish qualifications for deputy medical examiners.  ORS 146.085(2).  The appointment of deputy medical examiners is expressly conditioned upon the approval of the district attorney and applicable civil service regulations.  ORS 146.085(1).  This provision is similar to ORS 145.065(2) (added in 1973), which provides that district medical examiners "shall be appointed by the State Medical Examiner with approval of the appropriate board or boards of commissioners . . . ."  However, unlike ORS 145.065(2), which specifies that district medical examiners "may be discharged by the State Medical Examiner without the approval of the appropriate board or boards of commissioners, ORS 145.085(2) contains no similar language concerning the discharge of deputy medical examiners.

Once appointed, deputy medical examiners "investigate deaths subject to the control and direction of the district medical examiner _or_ the district attorney."  ORS 146.085(4) (emphasis added).  The use of the coordinating conjunction "or" is telling in this context in that it indicates that both the district medical examiner and the district attorney may control and direct the actions of deputy medical examiners.  Consistent with this statute, the job announcement regarding the Chief Deputy Medical Examiner position specified that the person hired would receive "direction from the District Attorney and the Oregon State Medical Examiner."  Graves Aff., Exhibit 10, p. 1.

The Multnomah County Charter, § 6.10, provides that the Chair of the Board of County Commissioners has the "sole authority to appoint . . . and discharge administrative officers and

37 - FINDINGS AND RECOMMENDATIONS

employees of the county, except for the personal staff, employees or agents of elective county offices." Short Decl. (docket #74), Exhibit 2. Boggs contends that this provision should be interpreted to include the district medical examiner as one of the officials whose employees are excluded from the County Chair's appointing authority. However, the exclusion covers employees or agents of *elective* county offices, presumably eluding to ORS Chapter 204. The district medical examiner is not an *elective* county officer and thus is excluded.

Boggs also argues that when the death investigation statute is read in context with other statutes relating to the same subject, the district medical examiner has exclusive authority to fire him. Specifically, he contends that the he was appointed by the district medical examiner (as a county officer) and, therefore, "hold[s] office during the pleasure of the [district medical examiner]" under ORS 204.601(2). The difficulty with this argument is twofold. First, there is some doubt that ORS Chapter 204 even applies to appointments by district medical examiners. Chapter 204 otherwise addresses the number, term, election, and compensation of certain elected county officers, including the sheriff, county clerk, county assessor, county treasurer, county surveyor, and county commissioners. ORS 204.005. While ORS 204.601 does not specify that it applies only to those officers mentioned in ORS 204.005, a fair inference from its placement in Chapter 204 is that it is so limited. Second, even assuming it applies, it is nevertheless subservient to any conflicting provision of county civil service law. ORS 204.121 ("no provision of ORS . . . 204.601 shall supersede any provision of the county civil service law, and when any conflict arises between any provision of ORS . . . 204.601 and any provision of the county civil service law, then the county civil service law shall prevail."). As explained above, the applicable provisions of Multnomah County's Personnel Rules authorize the district attorney

to fire Boggs.  Because ORS 204.121 expressly gives precedence to those rules, ORS 204.601

provides no safe haven.

### C.  Conclusion

In administrative respects, the Chief Deputy Medical Examiner (Boggs) had all the

indicia of being a County employee.  He reported to the District Attorney (an individual holding

an elective county office) and the District Medical Examiner (an individual paid by the county

responsible for death investigations in the county).  His hiring went through county hiring

processes, including his job application, interview, and notification of the hiring decision.  His

compensation and benefits were paid by the county, and the budget for those items fell under the

auspices of the District Attorney's office.  His job classification identified his position as

"District Attorney Executive Staff," which under county personnel rules is a position which

"report directly to and serve at the pleasure of the District Attorney."  State law charged him

with investigating deaths subject to the control and direction of the district medical examiner or

the district attorney.  ORS 146.085(4).  Based on the above, this court concludes that Multnomah

County's District Attorney (Schrunk) had the authority to force Boggs to resign or be fired.

Accordingly, defendants are entitled to summary judgment against the First, Second, Third, and

Fourth Claims for Relief.

Moreover, this decision obviates the necessity for this court to address Boggs' argument

that he is entitled to summary judgment that defendants are unable to meet their burden of

proving that he would have been terminated for misconduct learned of after his termination.

That issue relates to Multnomah County's Sixth Affirmative Defense which alleges that

Multnomah County would have made the same decision regarding Boggs' employment because

of after-acquired evidence of misconduct. *See* Multnomah County's Answer, ¶ 47.  However, given this court's conclusion that defendants are entitled to summary judgment on all but the Fifth Claim for Relief (Due Process claim) based on Schrunk's authorization to force Boggs to resign or be fired, the issue of whether Boggs would have later been fired is moot.

## RECOMMENDATIONS

For the reasons stated above, Boggs' Motion for Summary Judgment (docket #66) should be DENIED.  Schrunk's Motion for Summary Judgment (docket #75) should be GRANTED and all claims against him should be dismissed.  Multnomah County's Motion for Summary Judgment (docket #69) should be DENIED as to the Fifth Claim for Relief (Due Process violation) and otherwise GRANTED.  Accordingly, all that should remain for trial is Boggs' Fifth Claim for Relief against Multnomah County.

## SCHEDULING ORDER

Objections to these Findings and Recommendations, if any, are due September 8, 2008. If no objections are filed, then the Findings and Recommendations will be referred to a district judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendations will be referred to a district judge and go under advisement.

DATED this 21st day of August, 2008.


/s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge


40 - FINDINGS AND RECOMMENDATIONS