IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

ROBERT BOGGS,

                Plaintiff,                        3:07-cv-954-ST

        v.                                FINDINGS AND
                                              RECOMMENDATIONS

MICHAEL SCHRUNK and MULTNOMAH
COUNTY,

                Defendants.

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, Robert Boggs ("Boggs"), served as the Chief Deputy Medical Examiner of the

Multnomah County Medical Examiner's Office for over five years from August 1, 2001, until

early 2007 when he was asked to resign under threat of termination.   On May 10, 2007, Boggs

filed this action in Multnomah County Circuit Court, *Robert Boggs v. Michael Schrunk and*

*Multnomah County*, Case No. 0705-05342 ("*Boggs I*"), alleging a state law claim for declaratory

1 - FINDINGS AND RECOMMENDATIONS

and injunctive relief against Multnomah County and its District Attorney Michael Schrunk

("Schrunk"), as well as two claims for intentional interference with employment against Schrunk,

and a wage claim against Multnomah County.   Boggs subsequently amended his Complaint in

*Boggs I* to include a Fifth Claim under 42 USC § 1983 for violation of his due process rights

under the Fourteenth Amendment to the United States Constitution.   First Amended Complaint,

¶¶ 36-41.   Defendants thereafter timely removed *Boggs I* to this court.   Notice of Removal

(docket # 1), ¶ 5.

In April 2008, all three parties filed motions for summary judgment.   On August 21,

2008, this court recommended that Boggs's motion be denied and that defendants be granted

summary judgment against all claims except the Fifth Claim (due process violation) against

Multnomah County.   Findings and Recommendations (docket # 114) ("*Boggs I* F&R").   Less

than three weeks later, Multnomah County filed a Motion for Reconsideration (docket # 115),

contending that the court had failed to address the preliminary issue of a custom, policy, or

practice that would support liability against Multnomah County.   This court later held further

proceedings (including a partial evidentiary hearing on January 8, 2009) concerning the issue of

Multnomah County's liability on the Fifth Claim (docket # 128).[1]   Boggs requested additional

discovery and then filed a companion case, *Boggs v. Hoover, et al,* Civil No. 3:09-cv-00116-ST

("*Boggs II*"), after which this court stayed this case (*Boggs I*) pending the completion of

discovery and filing of dispositive motions in *Boggs II* (docket # 130).

The original Complaint in *Boggs II* alleged a single claim under 42 USC § 1983 for

violation of his Boggs's due process rights against:   (1) four individuals employed in the District

---

[1]   *See also* Official Court Transcript of Proceedings held January 8, 2009 (docket # 133) ("Transcript").

Attorney's Office:   Deputy District Attorney John K. Hoover ("Hoover") (Transcript, p. 37),

special counsel to the District Attorney, John C. Bradley ("Bradley") (*id*, p. 38), the District

Attorney's Executive Assistant, Jo'ey Stewart ("Stewart") (Stewart Decl.[2] (docket # 81), ¶ 1),

and Hoover's direct supervisor, Senior Deputy District Attorney Charles R. French ("French")

(Transcript, p. 62); and (2) two attorneys in the Multnomah County Attorney's Office:

Multnomah County Attorney Agnes Sowle ("Sowle") and Assistant Multnomah County

Attorney, Kathryn A. Short ("Short").   Boggs contended that these six individuals participated in

the publication of stigmatizing charges against him in connection with his termination and failed

to provide him with notice and an opportunity for a name-clearing hearing, thereby depriving

him of his liberty interest in violation of his due process rights under the Fourteenth Amendment.


On August 6, 2009, Judge Garr M. King dismissed the claims against Stewart with

prejudice due to the fact that her role as Schrunk's Executive Assistant, if any, was limited to the

clerical task of compiling documents for disclosure pursuant to the direction of others.   *Boggs II*

Order (docket # 55), adopting *Boggs II* F&R (docket # 33).   On August 1, 2011, this court

dismissed the claims against the remaining defendants because each of them was entitled to

qualified immunity based on *Tibbetts v. Kulongoski*, 567 F3d 529 (9th Cir 2009).   *Boggs II*

Order (docket # 117), adopting *Boggs II* F&R (docket # 105); Judgment (docket # 118).   On

---

[2]   Citations to declarations and affidavits are identified by the last name of the declarant or affiant and the paragraph(s) of the declaration or affidavit.   Citations to depositions are to the last name of the deponent and the page(s) of the deposition transcript.   The first citation to declarations and affidavits include identification of the case in which they are filed and the ECF docket number.

3 - FINDINGS AND RECOMMENDATIONS

August 22, 2011, Boggs filed an appeal with the Ninth Circuit which is currently pending.

*Boggs II* Notice of Appeal (docket # 122), Court of Appeals Case No. 11-35713.

On October 27, 2011, this court lifted the stay in this case.   Thereafter, Boggs filed a

Motion to Reconsider Findings and Recommendations (docket # 147) and Multnomah County

filed an Amended Motion for Reconsideration (docket # 151) with respect to the Fifth Claim.

For the reasons that follow, reconsideration should be GRANTED, and summary judgment

should be GRANTED to both Schrunk and Multnomah County on the Fifth Claim.

## UNDISPUTED FACTS

This court previously set forth the undisputed facts of this case in the *Boggs I* F&R

(docket # 114) (pp. 3-8).   They are summarized below and supplemented with evidence received

at the January 8, 2009 hearing:

In the 1990s, Boggs worked as a part-time Pathology Assistant for the Multnomah

County Health Department in the Division of the Medical Examiner.   Short Decl. (*Boggs I*

docket # 74), Ex. 20 ("Boggs Depo."), p. 8.   On October 27, 1997, Boggs applied for and was

appointed as a Deputy Medical Examiner for the Multnomah County District Attorney's Office

in the division of the Medical Examiner.   *Id*.   Boggs was promoted to the position of Chief

Deputy Medical Examiner and began working in that position on August 1, 2001.   *Id*, p. 9.

As the Chief Deputy Medical Examiner, Boggs supervised the Multnomah County

Deputy Medical Examiners and other personnel.   Dr. Karen Gunson ("Dr. Gunson"), the State

Medical Examiner, supervised all employees in the Multnomah County Medical Examiner's

Office either directly or indirectly through Boggs.   Boggs Decl. (Supplemental Affidavit of

Stephen L. Brischetto ("Brischetto Supp. Aff.") (docket # 94), Ex. 2), ¶ 13.   Neither Boggs nor

other employees in the Medical Examiner's Office had a direct reporting relationship with Schrunk or other employees in the District Attorney's Office.   *Id.*

As a supervisor, Boggs followed Multnomah County's personnel rules and consulted with the District Attorney's Office about personnel matters and processing of personnel forms and administrative paperwork.   Stewart Decl., ¶ 13; Boggs Decl., ¶ 14.   However, the District Attorney's Office did not interfere with the substantive personnel decisions made within the Medical Examiner's Office.   Boggs Decl., ¶ 14.

In early 2007, the Multnomah County Medical Examiner's Office employed nine regular staff, some on-call employees, and the Chief Deputy Medical Examiner.   Stewart Decl., ¶ 11. It is housed together with the State Medical Examiner's Office and the Clackamas County Medical Examiner's Office at one location in Clackamas, Oregon.   *Id.*

Multnomah County is governed by a Charter which designates the Chair of the Board of County Commissioners as the Chief Executive Officer and the personnel officer of Multnomah County.   Short Decl. (docket # 74), ¶ 3; Ex. 2.   The Chair delegates certain personnel responsibilities to various managers and has delegated the authority to hire and fire personnel to Schrunk.   Stewart Decl., ¶ 5.

Around November 6, 2006, Boggs brought to the attention of Stewart, Schrunk's Executive Assistant, a concern about one of his subordinates, Brian Applegate ("Applegate"), a Deputy Medical Examiner, misusing the Law Enforcement Data System ("LEDS") for personal purposes.   Stewart Decl.,   ¶¶ 1, 32.   LEDS contains criminal justice records and other sensitive information about individuals and is subject to administrative and database user rules that prohibit its use for personal purposes.   Schrunk Aff. (docket # 79), ¶¶ 8-9.   Any personal

use of LEDS violates the District Attorney's Office Policy Manual rules, as well as the LEDS contract.   Stewart Decl., ¶ 32; Brischetto Aff. (docket # 68), Ex. I, p. 16.   Boggs began an investigation into possible misconduct by Applegate.   Stewart Decl., ¶ 32.   During the course of the investigation, Applegate accused Boggs of also misusing LEDS for personal purposes, which Boggs denied.   *Id*; Von Ter Stegge Aff. (docket # 77), Ex. C., pp. 2-3.   Based on the result of Boggs's investigation, the District Attorney's office terminated Applegate for his misuse of LEDS on November 20, 2006.   Stewart Decl., ¶ 32.

Applegate filed a grievance concerning his termination alleging widespread misuse of LEDS in the Medical Examiner's Office to which a response was due by January 5, 2007.   As a result of Applegate's accusation, the District Attorney's office decided to audit Boggs and the other employees of the Medical Examiner's Office.   *Id*, ¶ 33.   Just before and during the audit, Boggs admitted that he used LEDS to look up his wife a couple of times.   *Id*, ¶ 34; Von Ter Stegge Aff., Ex. F.   The audit revealed that Boggs also had used LEDS for non-business purposes on many occasions.   Stewart Decl., ¶ 34 & Ex. 4.   When presented with a printout of his LEDS queries, Boggs recalled running a number of individuals other than his wife for personal purposes and his reasons for doing so.   Von Ter Stegge Aff., Ex. G.

After concluding the audit, Stewart prepared a draft investigative report ("investigative report") dated December 18, 2006, of her findings which she provided to Schrunk.   Brischetto Aff., Ex. I, pp. 2-5.   The investigative report recommended the immediate dismissal of Boggs and recommended that Applegate's dismissal be reduced to a two-week suspension without pay. *Id* at 4-5.   There is no evidence that this investigative report was ever placed in Boggs's personnel file.   Schrunk decided to terminate Boggs because he had lied in the course of the

Applegate investigation.   Schrunk Aff., ¶ 6.   Schrunk informed Dr. Gunson of his intention to

terminate Boggs.   Brischetto Supp. Aff., Ex. 4 ("Gunson Depo."), p. 78.   Dr. Gunson disagreed

with Schrunk and asked him to reconsider.   *Id*, pp. 78-80.

Despite Dr. Gunson's disapproval, Schrunk met with Boggs on January 5, 2007, and

asked for his resignation.   Schrunk Aff., ¶¶ 5-6.   Schrunk advised Boggs that if he did not

resign, he would be terminated and presented him with two letters, one terminating him and one

accepting his resignation.   Boggs Decl., ¶ 2.   Boggs signed a memorandum resigning effective

February 5, 2007.   Brischetto Aff., Exs. K & L.   Schrunk did not provide Boggs with an

opportunity to read the investigative report prior to his termination or provide him with notice of

any right to a hearing concerning the statements made about him in the investigative report.

Boggs Decl., ¶¶ 6, 7.   Had Schrunk or Multnomah County informed Boggs that he had a right

to a hearing, he would have requested such a hearing.   *Id*, ¶ 8.   Boggs was placed on

administrative leave on January 5, 2007.   Stewart Decl., ¶ 37 & Ex. 5.   At that time, his annual

salary was $68,103.   *Id*, ¶ 26.

By letter dated February 5, 2007, the date his resignation was scheduled to become

effective, Boggs's attorney notified both County Attorney Sowle and District Attorney Schrunk

of Boggs's intent to pursue a tort claim against Multnomah County and Schrunk and also

revoked his resignation.   Von Ter Stegge Aff., Ex. J (docket # 77-11).   That letter complained

that "Multnomah County and [Schrunk] have published false, defamatory statements about

Mr. Boggs which have a tendency to foreclose him from pursuing his normal occupation" and

have not "provided [him] with due process prior to interfering in his employment relationship

with [Dr. Gunson] or prior to publishing stigmatizing information concerning" him.   *Id*, p. 2.

7 - FINDINGS AND RECOMMENDATIONS

Schrunk forwarded the letter to both Sowle and to the Attorney General's Office.   Transcript, pp. 68, 70.

On February 6, 2007, Boggs began work at the Community Blood Center/Community Tissue Services as a Recovery Coordinator.   Boggs Depo., pp. 2, 4.   He was hired for that job some time prior to February 6, 2007.   *Id*.

Neither Multnomah County nor Schrunk contacted Boggs regarding the revocation of his resignation.   Boggs Decl., ¶ 5.   However, on February 8, 2007, Assistant County Attorney Short wrote a letter to Boggs's attorney advising him that the "County does not accept Mr. Boggs' 'rescission' of his resignation."   *Boggs II* Brischetto Decl. (docket # 100), Ex. B.   On February 21, 2007, Boggs's attorney responded with a letter to Short, Dr. Gunson, and Schrunk. *Boggs II* Brischetto Aff. (docket # 100), ¶ 7 and Ex. C (February 21, 2007 letter).   That letter characterized as "simply inaccurate" Short's "claim that Multnomah County has 'declined to accept' the rescission of [Boggs'] resignation" and contended that Boggs "remains employed by Multnomah County."   *Id*, p. 1.

For about the next two and a half months, Boggs's attorney and Short continued substantive discussions and negotiations concerning Boggs's employment status without reaching any resolution acceptable to Boggs.   *Boggs II* Brischetto Decl. (docket # 100), ¶ 12; *Boggs II* FTR Digital Recording of Court Proceedings, March 31, 2011, at 09:56:00 − 10:01:15.

On February 23, 2007, the District Attorney's office received a public records request from the *Portland Tribune* seeking access to materials relating to any investigation into employee use of LEDS, as well as "all public materials relating to any investigations − and the official results of those investigations − into the job-related behavior or job performance" of both

Boggs and Applegate.   Short Decl., Ex. 6, pp. 2-3.   The District Attorney's Office makes its

own determination on the release of public records.   Transcript, pp. 52, 56-57, 58-59.

Schrunk forwarded the public records request from the *Portland Tribune* to Senior

Deputy District Attorney French (then head of the "pretrial unit") and assigned Deputy District

Attorney Hoover to respond to the request.   *Id*, pp. 46-48, 67-70.   In a "brief conversation,"

Schrunk told Hoover to contact the persons who had the investigative report (Stewart) and the

records request (Bradley) and, since it involved an employment matter, the Multnomah County

Attorney (Sowle).   *Id*, pp. 47-48, 69, 74.

Schrunk expected Multnomah County to handle any due process obligation, although he

"didn't see a due process question" and "looked at it more of a basic public records request."   *Id*,

p. 75.   Hoover neither saw the February 5, 2007 letter from Boggs's attorney nor discussed its

contents with Schrunk, Bradley, or Stewart.   *Id*, pp. 48-49.   However, either Bradley or Stewart

advised Hoover that Boggs had retained an attorney and was attempting to "undo" his

resignation.   *Id*, p. 49.

Hoover also was unaware of Short's February 8, 2007, letter to Boggs stating that

Multnomah County refused to accept the rescission of his resignation.   *Id*. pp. 61-62.   Neither

Schrunk, Bradley nor Stewart informed Hoover that Boggs was asserting a claim for the failure

to provide due process prior to publishing stigmatizing information.   *Id*, p. 50.   Schrunk did not

specifically request Hoover to address the due process issues raised in the February 5, 2007

letter.   *Id*, pp. 69-70.

Hoover determined that no conditional exemptions applied under the Oregon public

records law to the request for the Applegate records.   *Id*, p. 41.   However, because Boggs was

contesting his termination, Hoover determined that the investigative report should not be

released because it may be conditionally exempt from disclosure under ORS 192.501(12) as a

"personnel discipline action, or materials or documents supporting that action."  *Id*, pp. 40-41.

While Hoover "evaluated the records [pertaining to Applegate and Boggs] separately . . . [he]

wanted, if we ever disclosed them, that it all be done at one time."  *Id*, p. 40.   He did not inform

the *Portland Tribune* that he was not going to disclose any records because he was "not

comfortable releasing the documents at that time, and . . . didn't hear anything further from The

Tribune asking how things were going."  *Id*, p. 60.   He would "just as soon not have discussed

the fact that Mr. Boggs might have been undergoing some disciplinary action as a result of the

resignation being overturned," so did not respond to the initial public records request and did not

discuss it further with anyone.  *Id*, p. 61.

On May 10, 2007, Boggs filed this lawsuit alleging that Schrunk had no authority to

force him to resign or to terminate him and that he was and remained employed as the Chief

Deputy Medical Examiner.  *Boggs I* Complaint, ¶¶ 1, 9-11, 14-16, 18.

On May 22, 2007, Hoover received a public records request from *The Oregonian* seeking

"all information concerning the performance, discipline and/or dismissal of [Boggs and

Applegate] during the last calendar year."   Short Decl., Ex. 6, p. 1.   The request noted that there

may be another pending media request for the information and asked that the information be

made available to both media entities simultaneously.  *Id*.   Hoover learned that Boggs had filed

a civil suit (*Boggs I*) and concluded that the records requested concerning Boggs were no longer

protected as a pending disciplinary action.   Transcript, pp. 43, 63-64.

10 - FINDINGS AND RECOMMENDATIONS

Hoover then consulted briefly with Bradley and Short regarding the availability of either the litigation or the disciplinary exemptions to disclosure under Oregon's public records law. *Id*, p. 59. He also consulted with Sowle and arranged for Short to review the records to determine whether any of them fell within the litigation exemption. *Id*, pp. 65, 78-79. Hoover did not know whether due process applied to the disclosure of the investigative report and received no information about due process during the three months between the first records request and the disclosure to the media. *Id*, pp. 76-77. Hoover made the final decision and, on behalf of the District Attorney's office, released the requested documents to the media on May 30, 2007. *Id*, pp. 42-43 and Short Decl., Ex. 7, p. 2 (indicating that *The Oregonian* obtained the investigative report through a public records request on May 30, 2007).

On May 31, 2007, an article appeared in *The Oregonian* titled "Morgue workers misused data" which repeated the charges made in the investigative report. Boggs read the article that same day and also heard a radio report containing references to him similar to those in *The Oregonian* article. Boggs Decl., ¶ 10. This was the first time that he learned of the specific statements made about him in the investigative report. *Id*, ¶ 7. Boggs believes the publication of this stigmatizing information precludes him from obtaining employment as a death investigator. *Id*, ¶ 12.

On June 18, 2007, Boggs amended his pleadings to allege the Fifth Claim, characterizing this case as one involving a "forced termination." *Boggs I* First Amended Complaint, ¶ 37.

In August 2007, six months into his new job, Boggs was promoted and given a pay increase to $75,000 per year.   Boggs Depo., pp. 2, 5.   He has not attempted to get a job as a medical examiner for any other county.   *Id*, p. 7.[3]

## FINDINGS

Both Multnomah County and Boggs have moved to reconsider this court's prior rulings with regard to the Fifth Claim for a violation of Boggs's due process rights.   Boggs contends that it was error to grant summary judgment for Schrunk on the Fifth Claim, and Multnomah County contends that it was error to deny it summary judgment on the Fifth Claim.   This court concludes that Schrunk remains entitled to summary judgment against the Fifth Claim, but that Multnomah County is also entitled to summary judgment against the Fifth Claim.   Accordingly, this court recommends granting both motions for reconsideration and disposing of the underlying summary judgment motions as follows:   (1) Boggs's Motion for Summary Judgment (docket # 66) should be DENIED; (2) Multnomah County's Motion for Summary Judgment (docket # 69) should be GRANTED; and (3) Schrunk's Motion for Summary Judgment (docket # 75) should be GRANTED.

## I.  Posture of the Motions

Schrunk argues that Boggs may not seek reconsideration of the *Boggs I* F&R because his motion is improper under FRCP 59(e) or 60(b).   Those provisions allow a party to file a "motion to alter or amend a judgment . . . no later than 28 days after the entry of the judgment" (FRCP 59(e)) and allow the court to "relieve a party . . . from a final judgment, order, or

---

[3]   With this pay increase, Boggs began earning "very close" to the same amount he was earning six months earlier in the Medical Examiner's Office.

proceeding" based on a number of reasons, including mistake, inadvertence, newly discovered evidence, fraud or "any other reason that justifies relief" (FRCP 60(b)).

This court agrees with Boggs that it is not precluded from considering the parties' motions to reconsider at this juncture.   No "judgment," much less a "final judgment," has been entered in this case.   In fact, no final ruling has ever been issued on the parties' three summary judgment motions (dockets ## 66, 69, and 75), as this case was stayed before the *Boggs I* F&R was referred to a district judge for a final ruling.   Multnomah County filed its initial Motion for Reconsideration (docket # 115) within three weeks from the issuance of the *Boggs I* F&R. Shortly thereafter, both the *Boggs I* F&R and that motion for reconsideration were stayed. Minute Order dated October 30, 2008 (docket # 120).   Following a partial evidentiary hearing and the filing of *Boggs II*, the entire case was stayed and remained stayed for over two and a half years while the parties litigated the issues in *Boggs II*.   Minute Orders dated February 12, 2009 (docket # 130) (staying case) and October 27, 2011 (docket # 143) (lifting stay).   The Federal Rules of Civil Procedure do not discuss motions for reconsideration, much less address how to handle motions in the posture presented here.   Absent authority precluding such action, wise judicial administration dictates that recommendations that are not final rulings may be reconsidered or amended by the issuing judge.   Accordingly, this court will not refuse to consider the motions for reconsideration based on FRPC 59 or 60.

**II.  <u>Due Process</u>**

The present motions concern the Fifth Claim which alleges that Schrunk and Multnomah County "deprived [Boggs] of liberty interests in his chosen occupation without providing due

process of law in violation of the Fourteenth Amendment to the US Constitution."   First

Amended Complaint, ¶ 40.   The factual allegations underpinning that conclusion are as follows:

> 37.
> Subsequent to plaintiff's forced termination, defendants published
> false, stigmatizing statements concerning the plaintiff which have the
> effect of foreclosing plaintiff's right to pursue his chosen occupation.
> 38.
> Each defendant failed to provide plaintiff with notice and an
> opportunity for a hearing prior to depriving plaintiff of his liberty interest
> in his chosen occupation.
> 39.
> Each defendant acted pursuant to the custom, policy and practice
> of Multnomah County and the District Attorney's Office.

In *Cox v. Roskelley*, 359 F3d 1105, 1110 (9th Cir 2004), citing *Bd. of Regents v. Roth*, 408

US 564, 573 (1972), the Ninth Circuit recognized that:

> [A]s early as 1972 . . . the United States Supreme Court established that a
> terminated employee has a constitutionally based liberty interest in
> clearing his name when stigmatizing information regarding the reasons for
> the termination is publicly disclosed.   Failure to provide a
> "name-clearing" hearing in such a circumstance is a violation of the
> Fourteenth Amendment's due process clause.

To establish such a claim, under what has become known as the "stigma-plus" test, the

plaintiff must prove "the public disclosure of a stigmatizing statement by the government, the

accuracy of which is contested, " plus the denial of a tangible interest such as employment.

*Ulrich v. City & Cnty, of San Francisco*, 308 F3d 968, 981 (9th Cir 2002) (citations omitted).

"Where these elements exist, the plaintiff is 'entitled to notice and a hearing to clear his name.'"

*Id*, quoting *Bollow v. Fed. Reserve Bank*, 650 F2d 1093, 1100 (9th Cir 1981).

14 - FINDINGS AND RECOMMENDATIONS

Boggs has presented evidence that Multnomah County publicly disclosed stigmatizing information about him no later than May 30, 2007, when it released portions of the investigative report to the media.   Boggs never received a name-clearing hearing and contends that the release of that stigmatizing information precludes him from employment as a death investigator. This case presents the vexing questions of whether the publication that, as a matter of law, was sufficient to trigger Boggs's due process interests, occurred any earlier than the actual release of the investigative report to the media on May 30, 2007, and, if so, whether Schrunk or Multnomah County are entitled to summary judgment on the basis of qualified immunity or the absence of a county custom, policy or practice.[4]

### A.   Schrunk

Boggs seeks reconsideration of the *Boggs I* F&R to the extent it granted summary judgment to Schrunk on the Fifth Claim.   His motion raises two issues.   First, it attacks the findings in the *Boggs I* F&R that Schrunk did not have sufficient personal involvement in order to be held liable for the due process violation alleged in the Fifth Claim.   Second, it seeks to have the court revisit whether *Cox* mandates a finding that "publication" sufficient to support the Fifth Claim for a due process violation took place some time prior to the disclosure of the investigative report to the media on May 30, 2007.   This court is not persuaded by either argument.   Moreover, as explained below, this court concludes that Schrunk is entitled to summary judgment for the same reasons as the individual defendants in *Boggs II*.

---

[4]   Boggs also alleges that he was injured pursuant to a "custom, policy and practice of . . . the District Attorney's Office." First Amended Complaint, ¶ 39.   The District Attorney's Office is not a named defendant and enjoys immunity to the extent it is acting as an agency of the State of Oregon.   This court construes this as a precautionary allegation merely meant to capture any and all actions by Schrunk which, though taken while at the helm of the District Attorney's Office, were taken on behalf of Multnomah County, which is the real party in interest.

1.  **Personal Participation**

In the *Boggs I* F&R, this court declined to address the issue of Schrunk's entitlement to qualified immunity because it concluded that Schrunk had insufficient personal involvement in the decision to release the investigative report to the media in order to impose liability.   Boggs now argues that Schrunk's participation (or lack thereof) in deciding to release the records to the media is not critical.   Instead, he argues that the critical issue is Schrunk's related failure to provide due process (in the form of a name-clearing hearing) in connection with the release of the records.

This court previously found that Schrunk delegated to Hoover the responsibility for responding the public records requests.   *Boggs I* F&R, pp. 11-12.   An exhaustive review of the record reveals that the additional evidence provided by Boggs does not contradict that finding. Boggs nonetheless urges that Schrunk had continued participation in the decision to disclose the investigative report after delegating the public records request to Hoover, citing Schrunk's testimony that he and Bradley (special counsel to the District Attorney) "worked together" and "must have spoken" about the agency's response to the public records request.   Transcript, p. 73. From those two snippets of testimony, Boggs concludes that Schrunk directly participated in the decision to disclose the investigative report.   However, without further elaboration as to how Schrunk and Bradley "worked together" and as to the content of the conversations Schrunk assumes that he must have had with Bradley, this testimony does nothing more than permit speculation about significant involvement by Schrunk.   Beyond his delegation of the matter to French and Hoover, the record reveals no further involvement by Schrunk in responding to the public records request.   Hoover unequivocally states that Schrunk did not direct him to release

the investigative report or any records relating to Boggs's resignation and that he made the final decision to release the records.   *Id*, pp. 42-43; Hoover Aff. (docket # 78), ¶ 9.   Hoover testified to nothing more than "listening" to his managers' initial opinions and thoughts and later "advising" them of "[his] position."   Transcript, pp. 42-43.   In short, the evidence cited by Boggs does not persuade this court that it should alter its previous conclusion concerning Schrunk's lack of personal involvement in the decision to release the investigative report.

The record in *Boggs II* includes an affidavit in which Shrunk avers that he "had sole, final authority to offer, schedule, or provide a name-clearing hearing to Mr. Boggs [and that he] made the decision not to offer Mr. Boggs a name-clearing hearing."   *Boggs II* Schrunk Aff. (docket # 94), ¶ 4.   Nothing in the record indicates that Boggs made any specific request for a name-clearing hearing.   However, to the extent any decision was made to deny a name-clearing hearing, this testimony identifies Schrunk as the sole decisionmaker.   Nonetheless, as explained below, Schrunk is entitled to qualified immunity.

### 2. __Qualified Immunity__

Boggs argues that three factors, in combination, preclude granting summary judgment to Schrunk, including his:   (1) knowledge that Boggs resigned under threat of termination; (2) previous interpretations of Oregon's public records laws that it does not apply the: (a) "litigation" exemption of ORS 192.501(1) to personnel disciplinary investigations; or (b) "personnel disciplinary" exemption of ORS 192.501(12) when an employee resigns under threat of termination; and (3) constructive or actual knowledge of the holding in *Cox*.   However, this court is persuaded that when *Cox* is properly applied to this case, Boggs faces an

insurmountable hurdle in establishing liability against Schrunk due to his entitlement to qualified immunity, an issue not decided in the *Boggs I* F&R.

Boggs's argument rests on an overly broad interpretation of *Cox* and an overly narrow interpretation of *Tibbetts v. Kulongosk*i, 567 F3d 529 (9th Cir 2009).    *Cox* holds that, under certain circumstances, a public record will be deemed "published" by operation of law for purposes of a due process claim.    In 2009, the Ninth Circuit held in *Tibbets* that a reasonable person would not have known in 2005 whether publication 19 days after termination would pass the temporal nexus test for a due process claim.    As discussed at length in the *Boggs II* F&R (docket # 105) (pp. 8-9, 14-18), this court rejects the notion that it was clearly established that publication sufficient for establishing a due process violation of a liberty interest took place in this case any time prior to the release of the investigative report to the media on May 30, 2007.

In *Cox*, a "termination letter was placed into, and made a part of, Cox's personnel file." *Cox*, 359 F3d at 1109.    The parties agreed "that once the stigmatizing information was placed into Cox's personnel file, it became a public record under Washington law, mandating disclosure upon request." *Id* at 1110.    The Ninth Circuit found that situation akin to *Buxton v. City of Plant City*, 871 F2d 1037 (11th Cir 1989), concerning a police officer fired after an internal affairs investigation.    Both the internal affairs report and the personnel file became public at the conclusion of the investigation which culminated with Buxton's termination.    *Id* at 1045.    The Ninth Circuit in *Cox* was "persuaded that the *Buxton* case properly analyzes an employee's liberty interests in remaining free from the public dissemination of stigmatizing information by his employer." *Cox*, 350 F3d at 1111.    It had not previously decided whether placement of stigmatizing information into a personnel file constituted sufficient publication because in two

earlier cases the employee did not suffer a termination but was instead transferred (*id* at 1112,

citing *Mustafa v. Clark County Sch. Dist.*, 157 F3d 1169, 1179 (9th Cir 1998)) or the stigmatizing

information was removed from the personnel file (*id* at 1110, citing *Llamas v. Butte Community*

*College Dist.*, 238 F3d 1123, 1129 (9th Cir 2001)).

      In both *Cox* and *Buxton*, the employees were fired.   There was no question as to their

employment status, and neither case involved any argument that the records in question were

subject to exemption from disclosure.   Here, in contrast, Boggs's employment status remained in

question until long after the disclosure of the investigative report to the media.   That is a critical

distinction in this case where the public records law in question, ORS 192.501(12), exempts

from disclosure records pertaining to a "personnel discipline action, or materials or documents

supporting that action."

      It has been somewhat difficult to identify the exact date of the alleged adverse

employment action taken against Boggs.   At least two dates have been proposed, including:

(1) January 5, 2007, when Schrunk presented Boggs with the choice of resignation or

termination; and (2) February 8, 2007, when Short advised Boggs's attorney that Multnomah

County did not accept Boggs's February 5, 2007 "rescission" of his resignation.   Likewise,

several additional "publication" dates have been proposed:   (1) May 10, 2007, when Boggs filed

suit, prompting Hoover (in late May 2007 in response to the second public records request) to

conclude that the personnel disciplinary exemption no longer applied to the investigative report;

and (2) sometime between May 22 and May 30, 2007, when Hoover actually concluded that the

investigative report was not exempt from disclosure; and (3) May 31, 2007, when *The*

*Oregonian* published portions of the investigative report.

19 - FINDINGS AND RECOMMENDATIONS

Boggs argues strenuously that *Cox* mandates a finding that the investigative report was sufficiently "published" for purposes of the Fifth Claim upon Schrunk's acceptance of his resignation on January 5, 2007, or, at the latest, on February 8, 2007, when Multnomah County rejected his request to revoke his resignation.   Boggs contends that Schrunk knew the investigative report was not exempt, but was a public record subject to disclosure as soon as Boggs submitted his resignation or when the County refused to allow him to revoke his resignation.   Boggs further argues that Schrunk also knew that Boggs claimed that the release of the stigmatizing statements violated his due process rights, but nevertheless failed to offer him (or cause his subordinates to offer him) a name-clearing hearing.   According to Boggs, this conclusion follows inescapably from the narrow interpretation of ORS 192.501(12) by the Oregon Attorney General ("AG") in its Public Records Manual.   Noting that "[n]either ORS 192.502(12) nor the relevant court decisions specify how the statute applies when a person seeks records in a filed in a pending personnel disciplinary matter," it provides as follows:

> Only completed disciplinary action when a sanction is imposed, and materials or documents that support that particular disciplinary action, fall within the scope of this exemption.   The exemption does not apply when an employee of a public body resigns during an employer investigation or in lieu of disciplinary action.   The policy underlying this narrowly construed exemption is to "protect[] the public employee from ridicule for having been disciplined but does not shield the government from public efforts to obtain knowledge about its processes."

*See* http://www.doj.state.or.us/public_records/manual/public_records.shtml (last accessed March 20, 2012).

Schrunk had previously relied on the AG's Public Records Manual when interpreting the "personnel disciplinary" exemption.   Brischetto Decl. (docket # 158), Exs. A, B & C.   Thus,

Boggs contends that it may fairly be inferred that Schrunk knew that when an employee resigns in lieu of termination, discipline has not been imposed under Oregon's Public Records law and this exemption does not apply.   Accordingly, he contends that the publication of the draft investigative report occurred by operation of law on either January 5, 2007 (the date he submitted his resignation), or on February 8, 2007 (when Multnomah County sent the letter declining to accept the revocation of his resignation).   However, the facts of this case simply do not bear out that interpretation.

Both *Cox* and *Buxton* involved terminated employees complaining about the potential dissemination of what was indisputably a *non-exempt* public record.   Here it is not at all clear that Boggs suffered a "disciplinary" action or that the investigative report was a public record subject to disclosure.

First of all, Boggs was not terminated, but resigned under threat of termination. Although Boggs submitted his resignation on January 5, 2007, effective February 5, 2007, he purported to revoke that resignation by letter dated February 5, 2007.   Short responded with a letter rejecting that "rescission" of his resignation.   Hoover, assigned to handle the public records request that arrived in late February 2007, was unaware of Short's letter and was told that Boggs was attempting to undo his resignation.   As of that date and continuing until this lawsuit was filed and through May 30, 2007, when portions of the investigative report were actually disseminated to the media, Boggs contended that Shrunk had no authority to force him to resign or be fired, that he revoked his resignation, and that he remained employed by Multnomah County.   Boggs's original Complaint filed on May 10, 2007, alleged that Schrunk had no authority to force him to resign or to terminate him and alleged that he had at all times

remained and still was employed as the Chief Deputy Medical Examiner.   *Boggs I* Complaint,

¶¶ 1, 9-11, 14-16, 18.   When Boggs amended and added the Fifth Claim, Boggs characterized

this case as one involving a "forced termination," referencing a quintessential "disciplinary"

action.   *Boggs I* First Amended Complaint, ¶ 37.

At a minimum, beginning with Boggs's attempt to revoke his resignation and continuing

until disclosure of the investigative report to the media, there was no clear-cut answer to the

question of whether the "personnel disciplinary" exemption applied.   Boggs's employment

status remained in question through at least the date he filed suit, leaving Hoover to sort out the

applicability of the exemption to what he viewed as a pending personnel disciplinary matter.

Hoover disclosed the investigative report after the second media request in late May 2007 only

because he concluded that the "possibility of the resignation being reversed and some

disciplinary action taking place was done."   Transcript, p. 43; *see also* pp. 63-64.

With Boggs's employment status in question, the applicability of the "personnel

disciplinary" exemption was far from clear.   Although the employment action began as a

resignation, it morphed into a rescission of that resignation, a refusal to honor the rescission,

vigorous negotiations over Boggs's employment status, and finally a lawsuit contending both

that Boggs had suffered a "forced termination," but at the same time remained employed by

Multnomah County.   On the present record, any number of arguments might be (and have been)

made about the applicability of the exemption in ORS 192.501(12) based on varying

interpretations of Boggs's employment status.   Following the logic of those arguments, various

"publication" dates have been proffered as triggering Boggs's due process claim.   These varying

interpretations highlight the murky waters in which defendants found themselves when

responding to the public records requests.   Nothing in the then-existing case law clearly

established that the investigative report was published as a matter of law under the logic of *Cox*

some time prior to May 30, 2007.

This leaves the question of whether Schrunk may be held directly liable for his decision

not to offer Boggs a name-clearing hearing.   Schrunk takes full responsibility for that particular

decision (separate and apart from the decision of how to respond to the public records request

which he delegated to Hoover).   Shrunk was aware of the due process concerns raised in

Boggs's February 5, 2007 letter.   Despite that knowledge, he did not offer Boggs a

name-clearing hearing even after the disclosure of the investigative report to the media.   A jury

might find that the disclosure of the investigative report followed closely enough on the heels of

Boggs's forced resignation/termination as to meet the temporal nexus test.   However, as

discussed at length in the *Boggs II* F&R, it was not clearly established in 2007 that due process

protections were triggered by the publication of stigmatizing statements 19 or 20 days after an

adverse employment action, the shortest time possible assuming all facts and inferences

therefrom in Boggs's favor.[5]   *Tibbetts* entitles Schrunk to qualified immunity for the same

---

[5]   In *Boggs II*, Boggs contended that the "decision date" might have been as late as May 10 or 11, 2007, when the Complaint was filed and served.   This shortened the time between the adverse employment decision and the publication to 19 or 20 days, strengthening Boggs's argument that the employment decision and the publication of the stigmatizing information were sufficiently close in time to meet the temporal nexus test.   To the degree the time period is any longer, it merely strengthens Schrunk's argument that he is entitled to qualified immunity.

However, in the briefing and at oral argument on the present motions, Boggs contends that the relevant employment "decision" date was either January 5, 2007, when he resigned, or on February 8, 2007, when the County refused to honor the revocation of his resignation.   Plaintiff's Memorandum in Support of Motion to Reconsider Findings and Recommendations (docket # 148), p. 7, n.3.   Under his interpretation, because the publication of the stigmatizing information took place as a matter of law under *Cox* when he initially resigned (January 5, 2007) or when his "rescission" of his resignation was rejected (February 8, 2007), the publication and the adverse employment action occurred simultaneously, obviating any inquiry into the timing of those events.

In prior proceedings, this court concluded that Schrunk had the authority to force Boggs to resign or be fired. *Boggs I* F&R (docket # 114), pp. 24-40.   While Boggs characterizes the event that transpired on either January 5 or February 5, 2007, as a resignation for purposes of Oregon's public records law (such that the "personnel disciplinary" exemption does not apply and publication occurred as a matter of law under *Cox*), his due process claim ultimately hinges on a showing that he was terminated or otherwise suffered a non-retention decision at the hands of his employer.   *See id,* p. 13.   Assuming it is ultimately

23 - FINDINGS AND RECOMMENDATIONS

reasons as the individual defendants in *Boggs II*.    Accordingly, Schrunk should be granted

qualified immunity against the Fifth Claim.

### 3.  **Supervisory Liability**

Boggs also argues that Schrunk is liable as a supervisor because he:   (1) knew of the tort

claims notice raising due process concerns; and (2) delegated the public records request to

Hoover without informing him of those due process concerns.[6]   According to Boggs, the failure

to train, control, and supervise Hoover concerning the provision of due process and his callous

indifference to the due process issues raised in the February 5, 2007 letter is sufficient to subject

him to supervisory liability.

The Ninth Circuit allows a plaintiff to "state a claim against a supervisor for deliberate

indifference based upon the supervisor's knowledge of and acquiescence in unconstitutional

conduct by his or her subordinates."   *Starr v. Baca*, 652 F3d 1202, 1207 (9th Cir 2011).

However, even accepting the theoretical availability of supervisory liability, this permutation of

the Fifth Claim[7] also runs up against the roadblock presented by *Tibbetts*.   Whether stated as a

claim for direct involvement by deciding to deny a name-clearing hearing, or as a claim for

supervisory liability by delegating the decision of whether to release the investigative report

---

determined that Schrunk had authority to fire Boggs or force his resignation (by adoption of the *Boggs I* F&R or otherwise), the date of Boggs's "forced termination" was either January 5 or February 5, 2007.

[6]   This argument was not raised in the initial round of summary judgment motions.   It is raised only in passing in Boggs's memoranda on the motion for reconsideration and was not addressed by defendants.   *See* Plaintiff's Memorandum in Support of his Motion to Reconsider (docket # 148), pp. 9-10; Plaintiff's Reply Memorandum in Support of Motion to Reconsider (docket #165), p. 5.

[7]   The Fifth Claim contains no express allegations of supervisory liability.   The pleadings do not allege that Schrunk supervised any individual, other than as may be inferred from the allegation that he was the District Attorney for Multnomah County.   First Amended Complaint, ¶ 2.   Instead, the pleadings are silent about Schrunk's supervisory role over any individual other than Boggs, over whom the pleadings deny that Schrunk had any authority to make employment decisions. *Id*, ¶¶ 10-12.

without providing guidance as to any due process issues, Schrunk should be granted qualified

immunity under *Tibbets* because no publication sufficient to trigger due process concerns took

place prior to May 30, 2007.

### B.  **Multnomah County**

In its request for reconsideration, Multnomah County argues that it is entitled to summary

judgment against the Fifth Claim because Boggs has failed to establish that its policies or

customs were the moving force causing a violation of his due process rights.

### 1.  **Legal Standard for Municipal Liability**

Even though its employees are entitled to qualified immunity, a local government may

still be subject to liability under § 1983 for causing a constitutional violation.  *Trevino v. Gates*,

99 F3d 911, 918 (9th Cir 1996), citing *Owen v. City of Independence,* 445 US 622, 651-52

(1980).   However a local government cannot be held liable under a *respondeat superior* theory.

*Monell v. Dep't of Soc. Servs. of New York*, 436 US 658, 691 (1978).   Instead, liability must be

based on one of three theories:

> First, the plaintiff may prove that a city employee committed the
> alleged constitutional violation pursuant to a formal governmental policy
> or a longstanding practice or custom which constitutes the standard
> operating procedure of the local governmental entity.   Second, the
> plaintiff may establish that the individual who committed the
> constitutional tort was an official with final policy-making authority and
> that the challenged action itself thus constituted an act of official
> governmental policy.   Whether a particular official has final
> policy-making authority is a question of state law.   Third, the plaintiff
> may prove that an official with final policy-making authority ratified a
> subordinate's unconstitutional decision or action and the basis for it.

*Id*, citing *Gillette v. Delmore,* 979 F2d 1242, 1346-47 (9th Cir 1992) (citations and internal

quotations omitted), *cert denied,* 510 US 932 (1993).

25 - FINDINGS AND RECOMMENDATIONS

Boggs argues a violation of § 1983 under the first theory of liability based on an official policy or longstanding custom.   A "policy can be one of inaction or action."   *Long v. County of Los Angeles*, 442 F3d 1178, 1185 (9th Cir 2006), citing *City of Canton v. Harris*, 489 US 378, 388 (1989).   Under *Canton*, "a plaintiff can allege that through its omissions the municipality is responsible for a constitutional violation committed by one of its employees, even though the municipality's policies were facially constitutional, the municipality did not direct the employee to take the unconstitutional action, and the municipality did not have the state of mind required to prove the underlying violation."   *Id* at 185-86, citing *Canton*, 489 US at 387-89.   To establish a claim, the plaintiff must prove that:   "(1) that a county employee violated the plaintiff's constitutional rights; (2) that the county has customs or policies that amount to deliberate indifference; and (3) that these customs or policies were the moving force behind the employee's violation of constitutional rights."   *Id*, citing *Gibson v. County of Washoe*, 290 F3d 1175, 1193-94.

### 2.  <u>Analysis</u>

Boggs first must convince a factfinder that his constitutional rights were violated by Multnomah County employees which, in this case, is a combination of Hoover publicly disclosing the investigative report and Schrunk denying Boggs a name-clearing hearing. Assuming he does so, he then may establish liability against Multnomah County by proving that it had customs or policies that amounted to deliberate indifference to his due process rights and that those customs or policies were the moving force behind the violation.

Boggs identifies three written Multnomah County policies as being constitutionally deficient:   (1) Executive Rule No. 0300, "Complying with a Public Records Request from the

Media" adopted August 24, 2006; (2) Administrative Procedure Rec–2, "Multnomah County

Public Records Disclosure Practice" dated August 10, 2007; and (3) Executive Rule No. 0301,

"Retention of Public Records," signed by the Multnomah County Chair on September 29, 2006.

*See* Brischetto Decl. (docket # 158), Exs. E, F, and G.   Taken together, these policies grant

broad-ranging discretion to Multnomah County employees to release public records upon

demand unless the employee believes a record may be exempt from disclosure.   Boggs contends

that these policies are constitutionally deficient because they delegate authority to County

employees to disclose public records, but contain no procedure or guidance for when or how to

provide due process protections when disclosing stigmatizing public records.

### a.   Direct Liability

Boggs first contends that he can establish a "direct path to municipal liability."

*Gibson*, 290 F3d at 1185.   When relying on this theory of direct liability, the question is whether

the "municipality itself violated a person's rights or directed its employee to do so [and] the focus

is on the municipality's 'policy statement, ordinance, regulation or decision officially adopted

and promulgated by the body's officers.'"   *Id*, quoting *City of St. Louis v. Praprotnik*, 485 US

112, 121 (1988).   According to Boggs, Multnomah County's policies with regard to the

disclosure of public records are facially unconstitutional.   To prevail on this ground, Boggs

must "establish that no set of circumstances exists under which [the policies] would be valid."

*United States v. Salerno*, 481 US 739, 745 (1987); *see also Hotel & Motel Ass'n of Oakland v.*

*City of Oakland*, 344 F3d 959, 971 (9th Cir 2003) (applying *Salerno* to vagueness claim and

requiring a showing that the legislation is impermissibly vague in all of its applications).   Boggs

clearly cannot meet this taxing standard.

The policies at issue do not direct County employees to violate the due process rights of terminated employees, prohibit name-clearing hearings under any circumstance, or mandate the public disclosure of personnel files irrespective of content.   Instead, the policies direct County employees to comply with Oregon's public records law and are silent as to specific contexts in which they might be called upon to interpret or apply that law.   Multnomah County also directs its employees "to comply with . . . other relevant federal, state, or local laws" (Executive Rule No. 0301) and not to "[v]iolate any federal, state, or local laws" (Personnel Rule 3-10-020(L)(4)), and leaves it up to the particular records custodian to determine the scope of that obligation. There are many contexts in which these policy directives can be applied without violating the United States Constitution and, as a result, the policies survive this challenge to their facial validity.

Multnomah County also argues that, in any event, it cannot be held liable for the allegedly unconstitutional policies because the evidence shows that the policies were not followed.   It cites Administrative Procedure REC-2 that "[o]nly the County Attorney can make a final determination that a record is exempt," and points out that Hoover, not County Attorney Sowle, made the final decision to disclose the records.   The difficulty with this argument is twofold.   First, Hoover testified unequivocally that the "District Attorney's Office makes its own determinations on the release of public records."   Transcript, pp. 52-53.   Contrary to Multnomah County's position, that testimony supports Boggs's contention of a custom of allowing County employees to decide whether to disclose public records unfettered by resort to the Multnomah County Attorney.   Second, Hoover ultimately determined that the exemption did *not* apply and released the requested records.   The policy only requires that the matter be routed

to the County Attorney for a final determination if a County employee makes a preliminary determination that the record *is exempt*.   While Hoover arguably failed to follow the County policy after receiving the first media request (in that he thought that an exemption applied and did not send the matter to the County Attorney), he ultimately determined that the exemption did not apply, thus obviating any need to send the matter to the County Attorney for a final determination.

### b.  Liability by Omission

Another route to municipal liability is to allege that "through its *omissions* the municipality is responsible for a constitutional violation committed by one of its employees, even though the municipality's policies were facially constitutional, the municipality did not direct the employee to take the unconstitutional action, and the municipality did not have the state of mind required to prove the underlying violation."   *Gibson*, 290 F3d at 1186 (emphasis in original), citing *Canton*, 489 US at 387-89.   The issue is whether there is evidence "from which a jury could properly conclude that [Multnomah] County's failures to act caused its employees to violate [Boggs's] rights, and that those failures amounted to deliberate indifference under *Canton*."   *Id* at 1187.

Boggs argues that Multnomah County failed both to:   (1) include additional guidance in its policies concerning the necessity of, and process for, providing due process protections when releasing stigmatizing information about former employees; and (2) adequately train its employees on these same issues.

///

///

### i. __Statutory Presumption in Favor of Disclosure__

Oregon has a "strong and enduring policy that public records and governmental activities be open to the public . . . embodied in a statutory presumption that documents will be disclosed to the public" and mandates that "[e]xemptions from disclosure are to be narrowly construed." *City of Portland v. Oregonian Pub. Co.*, 200 Or App 120, 124, 112 P3d 457, 459 (2005) (internal quote marks and citations omitted).   Consistent with that policy, Oregon's public records law does not contain a blanket exemption from disclosure for personnel records.   Instead, it contains "Conditional exemptions from disclosure" and provides that personnel records, among others, are exempt from disclosure "*unless* the public interest requires disclosure in the particular instance."   ORS 192.501 (emphasis added).   As a result, personnel records are subject to disclosure if they either:   (1) were generated in support of something other than "discipline" taken against the employee; or (2) are matters of "public interest."

As reflected in the AG's Public Records Manual, "the public interest typically favors disclosure if the conduct potentially constitutes a criminal offense or if the records relate to alleged misuse and theft of public property by public employees."   *See* http://www.doj.state.or.us /public_records/manual/public_records.shtml (Section I.E.4.c(12)) (last accessed March 20, 2012).   Public employee personnel records involving a variety of stigmatizing charges have been found subject to disclosure.   *See, e.g., City of Portland v. Anderson*, 163 Or App 550, 988 P2d 402 (1999) (high ranking police officer patronizing an escort service); *Oregonian Pub. Co. v. Portland School Dist. No. 1J*, 144 Or App 180, 925 P2d 591 (1996) (misuse and theft of school district property).   In short, the public interest will typically outweigh a public employee's confidentiality interests and mandate public disclosure in

those cases where the employee is accused of engaging in serious misconduct.   Those same

situations predictably will involve stigmatizing charges that may form the basis of a due process

claim if the employee is terminated and denied a name-clearing hearing.

### ii.  <u>Application of the Deliberate Indifference Standard</u>

Boggs contends that Multnomah County is liable based on its inaction in the face of this

longstanding state statutory policy favoring public disclosure.   Other than a general policy that

its employees will not violate any federal law, the record reveals no policy or guidance by

Multnomah County concerning how to respond to a public records request for documents

containing stigmatizing information that may invoke a former employee's due process right to a

name-clearing hearing.   Any such policy necessarily requires training of employee on how to

first recognize stigmatizing information and how to proceed prior to disclosing such information.

Because of this omission, Boggs argues that Multnomah County may be held liable on a

failure to train theory.   "Failure to train may amount to a policy of 'deliberate indifference' if the

need to train was obvious and the failure to do so made a violation of constitutional rights

likely." *Dougherty v. City of Covina*, 654 F3d 892, 900 (9th Cir 2011), quoting *Canton*, 489 US

at 390.   Multnomah County points out that Boggs does not specifically allege that it failed to

provide due process as a result of a failure to train.   However, a failure to train claim is a

subcategory of an "inaction" claim.   *Waggy v. Spokane County Wa.*, 594 F3d 707, 713 (9th Cir

2010) ("a municipality's failure to train its employees is one such claim of omission or inaction

by the municipality"), citing *Canton*, 489 US at 392.   Here the failure to have additional policies

or guidance and the failure to train are so closely related that this court considers them as one

and the same alleged inaction.

Unfortunately for Boggs, the Supreme Court has recently adopted a very high threshold to prove a failure to train claim. *Connick v. Thompson*, ___ US ___, 131 S Ct 1350 (2011). In *Connick,* the plaintiff was wrongfully convicted of armed robbery based on the prosecutor's failure to disclose a crime lab report which constituted a *Brady* violation. After his conviction was vacated, the plaintiff brought an action under § 1983 against the district attorney's office for failing to adequately train its prosecutors. The Supreme Court confirmed that "[i]n limited circumstances," a local government's decision not to train may rise to the level of "an official government policy for purposes of § 1983." *Id* at 1359. However, that "culpability is at its most tenuous where a claim turns on a failure to train." *Id.* That failure to train "must amount to 'deliberate indifference to the rights of person with whom the [untrained employees] come into contact.'" *Id,* citing *Canton,* 489 US at 388. The deliberate indifference standard is "stringent" and requires "proof that a municipal actor disregarded a known or obvious consequence of his action." *Id* at 1360, citing *Board of Comm'rs of Bryan Cty v. Brown,* 520 US at 410 (1997).

To provide sufficient notice to the decisionmakers of the obvious consequence of failing to provide training, such proof "ordinarily" necessitates "[a] pattern of similar constitutional violations by untrained employees." *Id.* It acknowledged that a pattern of similar violations might not be necessary "in a narrow range of circumstances," such as deploying armed police officers to capture fleeing felons without training them in the constitutional limitation on the use of deadly force. *Id* at 1361, citing *Canton*, 489 US at 390 n10. However, it concluded that a "[f]ailure to train prosecutors in their *Brady* obligations does not fall within the narrow range of *Canton's* hypothesized single-incident liability." *Id.* Unlike the example in *Canton,*

32 - FINDINGS AND RECOMMENDATIONS

prosecutors, unlike untrained police officers, have legal training covering most situations faced by prosecutors.   *Id* at 1361-64.

> In light of this regime of legal training and professional responsibility, recurring constitutional violations are not the "obvious consequence" of failing to provide prosecutors with formal in-house training about how to obey the law. . . . A district attorney is entitled to rely on prosecutors' professional training and ethical obligations in the absence of specific reason, such as a pattern of violations, to believe that those tools are insufficient to prevent future constitutional violations in 'the usual and recurring situations with which [the prosecutors] must deal.

*Id* at 1363, quoting *Canton,* 489 US at 391.

The possibility of making a wrong decision is not sufficient because in virtually every instance, a plaintiff can point to something the municipality could have done to prevent the harm. *Id* at 1363.   Instead, the plaintiff "had to show that it was *so* predictable that failing to train the prosecutors amounted to *conscious disregard* for defendants' *Brady* rights."   *Id* at 1365 (emphasis in original).

Here, as in *Connick,* the final decision to disclose the investigative report was made by Hoover, a lawyer.   Boggs attempts to distinguish *Connick* on the basis that it involves legally trained employees making highly nuanced decisions, unlike the policy at issue here that allows clerical employees without legal training to disclose public records.   In addition, he points to the complete lack of any name-clearing procedure.   However, the touchstone in *Connick* is that in order to avoid *respondeat superior* liability, there must be notice to the decisionmaker that training would have been helpful in avoiding a constitutional injury.   Absent some pattern of similar due process violations by untrained employees, it would not be highly predictable to Multnomah County that stigmatizing information would be disclosed without first offering a

name-clearing hearing to a terminated employee.    This is particularly true when the final

decision is being made by a lawyer in the District Attorney's Office.    That decision may have

been wrong, but was not obviously wrong in light of the temporal nexus issue presented by this

case.

In addition, Boggs never requested a name-clearing hearing either before or after the

publication of the investigative report.    As this court previously noted, the majority of federal

circuits have held that a plaintiff is required to request a name-clearing hearing prior to filing a

due process claim.    *Boggs II* F&R (docket # 33), p. 14.    However, neither the Supreme Court

nor the Ninth Circuit have yet imposed that requirement.    *Id*, pp. 14-15.    This adds an

additional grey area to the final disclosure decision at issue.

In sum, this court concludes that Boggs has not presented sufficient evidence to prove

that Multnomah County was on notice of a high probability of a constitutional violation and,

thus, it could not have been deliberately indifferent to a need for a policy, guidance, or training

as to Boggs's right to a name-clearing hearing.    Accordingly, Multnomah County should be

granted summary judgment on the Fifth Claim.

## RECOMMENDATIONS

To the extent they request reconsideration of the *Boggs I* F&R (docket # 114), Boggs's

Motion to Reconsider Findings and Recommendations (docket # 147) and Multnomah County's

Amended Motion for Reconsideration (docket # 151) should be GRANTED.    Accordingly:

(1) Boggs's Motion for Summary Judgment (docket # 66) should be DENIED;

(2) Multnomah County's Motion for Summary Judgment (docket # 69) should be

GRANTED;

34 - FINDINGS AND RECOMMENDATIONS

(3) Schrunk's Motion for Summary Judgment (docket # 75) should be GRANTED; and

(4) this case should be dismissed with prejudice.

## <u>SCHEDULING ORDER</u>

The Findings and Recommendations will be referred to a district judge.   Objections, if any, are due April 20, 2012.   If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.   When the response is due or filed, whichever date is earlier, the Findings and Recommendations will go under advisement.

DATED April 3, 2012.

s/ Janice M. Stewart _____
Janice M. Stewart
United States Magistrate Judge

35 - FINDINGS AND RECOMMENDATIONS